# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10165

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

BILLY FRED GENTRY, JR., also known as Fred Gentry; NICOLE CYNTHIA HERRERA, also known as "Nikki Single"; BILLY RAY SKAGGS; CHARLES BEN BOUNDS, also known as Pretty Boy; TRAE SHORT, also known as "Twig"; KEVIN KYLE KILLOUGH, also known as Kilo; MICHAEL CLAY HEASLET,

Defendants - Appellants

United States Court of Appeals
Fifth Circuit

**FILED**
October 28, 2019

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Northern District of Texas

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case involves a direct criminal appeal by seven defendants from a jury trial that resulted in each defendant's conviction on a single count: conspiracy to possess with intent to distribute 50 grams or more of methamphetamine ("meth"). The defendants—Charles Ben Bounds, aka "Pretty Boy" ("Bounds"), Nicole Cynthia Herrera, aka "Nikki Single" ("Herrera"), Michael Clay Heaslet ("Heaslet"), Billy Ray Skaggs ("Skaggs"),

No. 17-10165

Kevin Kyle Killough, aka "Kilo" ("Killough"), Billy Fred Gentry, Jr., aka Fred Gentry ("Gentry"), and Trae Short aka "Twig" ("Short")—each appeal a distinct set of issues ranging from pretrial rulings to sentencing decisions. We hold that the district court erred in calculating the quantity of drugs attributable to Killough at sentencing. We AFFIRM on all other issues. We therefore VACATE Killough's sentence and REMAND to the district court for resentencing.

## General Factual Background

Following the government's third superseding indictment, a grand jury in the Northern District of Texas returned a true bill charging all seven defendants with one count: violation of 21 U.S.C. § 846, conspiracy to possess with intent to distribute meth. Although not all of the defendants were members of the Aryan Brotherhood of Texas, trial evidence connected the conspiracy to that group.

The case proceeded to a jury trial, which was held over four days from August 29 through September 1, 2016. Various cooperating witnesses testified about their own roles in the conspiracy as well as the defendants' roles. The government also introduced testimony from local law enforcement officers and case agents from the Drug Enforcement Administration ("DEA") and the Department of Homeland Security ("Homeland Security"). The jury found all seven defendants guilty of the single count in the indictment.

Thereafter, the district court sentenced each defendant separately, as follows:

- Bounds: 360 months imprisonment
- Herrera: 300 months imprisonment
- Heaslet: life imprisonment
- Skaggs: 300 months imprisonment
- Killough: life imprisonment
- Gentry: 360 months imprisonment

No. 17-10165

- Short: life imprisonment

Each defendant filed a timely notice of appeal.

## Bounds

Bounds argues that the district court erred in denying his motions to substitute counsel and his attorney's motions to withdraw because: (1) his attorney had an irreconcilable conflict of interest, and (2) there had been a complete breakdown in communication. Bounds asserts both that these errors violated his Sixth Amendment rights and amounted to an abuse of discretion. Bounds also appeals the district court's application of a two-level obstruction-of-justice sentence enhancement under U.S.S.G. § 3C1.1. We AFFIRM.

### I. Summary of Relevant Facts and Proceedings

The district court appointed Mark Danielson ("Danielson") to represent Bounds on April 12, 2016. On June 13, Bounds filed a pro se motion entitled, "Motion Amicus Curiae Adversary," which alleged that his counsel was ineffective. The district court issued a written order requiring Danielson to meet with Bounds and attempt to resolve their differences. The order advised, "Often what appear to be irreconcilable differences between a defendant and appointed counsel . . . are nothing more than misunderstandings that can readily be resolved by frank and open discussions."

One day after Danielson and Bounds met, Bounds filed another motion entitled, "Defendants Motion to Dismiss Counsel." This motion complained that Danielson was filing motions without Bounds's permission, expressed Bounds's desire to obtain a full copy of his discovery, and stated that Bounds could not come to an understanding with Danielson. The district court set a hearing for July 1. At the hearing, the district court asked Bounds if it was still his desire to discharge Danielson, and Bounds said no. Bounds said he had changed his mind and the disagreement was based on a misunderstanding. Danielson agreed that he and Bounds could continue to work together.

3

No. 17-10165

About a month later, on July 25, Danielson filed a motion to withdraw. The motion explained that "[a]t the most recent attorney-client conference on July 15, 2016 the defendant refused to discuss trial preparation issues with counsel, instead resuming his complaints and accusing counsel of being dishonest with him." According to the motion, Bounds told Danielson that Bounds would "again complain to the judge about [Danielson's] representation and ask for new counsel," and then Bounds "stormed out of the conference room." The motion concluded, "Based on the foregoing, counsel believes that the attorney-client relationship is irreparably damaged and that he has no remaining option but to request to be relieved of further representation of the defendant."

The district court set a hearing on the motion for July 29, with trial set to begin on August 22. At the hearing, Mr. Bounds described his conflict with Danielson:

> During counsel's appointment, my requests for discovery [have] continuously been denied, and, therefore, counsel's performance is deficient in this respect. Therefore, I respectfully request that the Court orders counsel to provide me with discovery in my case and all documents that are non-work product or trial material, and a continuance to allow me to review my case before I decide to accept a plea or reject a plea.

Danielson responded that he had shown Mr. Bounds copies of all the pertinent reports, but he could not give Bounds copies to keep in the jail. Ultimately, the district court concluded that the trial date was "too close" to "change an attorney." The district court admonished Bounds that Danielson was "an excellent attorney, and if you give him a chance, he'll do you a good job. If you don't give him a chance, he'll do the best he can, but he could do a whole lot better job if you cooperate with him and listen to what he says." The district court also explained that "sometimes lawyers have to make judgments because of the time elements and do what they think is best for their client."

4

No. 17-10165

After the hearing, Bounds sent Danielson a series of emails detailing continued distrust and requesting that Danielson take various legal actions including "file a motion to [sever]" and a "motion of discovery." Danielson responded at some length, explaining his reasons for not filing the motions and clarifying that while the decisions of whether to plead guilty and testify belonged to Bounds, "other tactical decisions are for your lawyer to make."

On August 26, three days before trial was scheduled to begin, Danielson filed an "Ex-Parte Notice of Actual Conflict of Interest and Second Motion to Withdraw." The motion stated that "every conversation" Danielson had had with Bounds "included at least one outburst by Mr. Bounds complaining about [Danielson's] representation" and that Bounds had recently sent a "profanity-laced email" demanding a certain course of action. Danielson also explained that he had recently received notice from the Office of Disciplinary Counsel of the State Bar of Texas that Bounds had filed a formal grievance against him. The grievance had been dismissed, but that dismissal was appealable. Danielson explained that he felt he was now "essentially representing two parties who are involved in a legal conflict with one another: Mr. Bounds and myself."

On August 29, the morning trial began, the district court held a hearing on Danielson's second motion to withdraw. The district court denied Danielson's motion to withdraw, finding "no genuine or actual conflict" between Danielson and Bounds. The district court found, instead, that there was "a false, contrived conflict created by Bounds with the desired intent to disrupt the judicial process in this case."[1] Trial proceeded without incident between Danielson and Bounds.

---

[1] The district court gave the following, more extensive assessment:

No. 17-10165

At sentencing, Danielson objected to a two-level sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on the conduct described above. The district court overruled Danielson's objection, stating that he had no reason to change his previous factual finding that Bounds had attempted to "obstruct the orderly procedures in this courtroom" and "interfere with the fair administration of justice." The district court ultimately sentenced Bounds to 360 months, at the bottom of the 360-to-480-months United States Sentencing Guidelines ("Guidelines") range.

## II. Analysis

### A. Denial of Requests for Substitute Counsel

"In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Sixth Amendment claims receive de novo review. *United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011). "[I]f [the Sixth] Amendment has not been violated, the trial court's refusal to appoint substitute counsel is reviewed for an abuse of discretion." *Id.* at 307. "A district court abuses its discretion if it bases its decision on an error

---

To grant Danielson's Motion to Withdraw would invite criminal defendants to take the same type of extraordinary steps that Bounds has taken in this case to disrupt a criminal proceeding or to engage in selection of counsel of the defendant's choice.

The Court has no reason to think that anything has happened that would adversely affect the quality of Danielson's representation of Bounds at trial. Apparently, Danielson has some strong feelings on that subject, but my experience with him is that he's not going to allow what has happened to adversely affect the quality of his representation of Bounds.

. . .

To perhaps make the matter less stressful to you, the Rule 1.15 of the Texas Rules of Professional Conduct says that you're relieved of the obligation to withdraw under the circumstances that we discussed earlier if you're ordered by a tribunal to continue to represent the defendant, so I'm ordering you to continue to represent Mr. Bounds.

No. 17-10165

of law or a clearly erroneous assessment of the evidence." *United States v. Teuschler*, 689 F.3d 397, 399 (5th Cir. 2012) (quoting *United States v. Castillo*, 430 F.3d 230, 238–39 (5th Cir. 2005)).

### 1. Conflict of Interest

"[A] lawyer's conflict of interest may be so flagrant as to constitute a violation of the Sixth Amendment." *Simpson*, 645 F.3d at 310. Where an attorney's alleged conflict of interest "springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client," *Strickland v. Washington,* 466 U.S. 668 (1984), applies. *Beets v. Scott*, 65 F.3d 1258, 1260, 1272 (5th Cir. 1995). Under *Strickland*, a defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." 466 U.S. at 687.

Even assuming arguendo that Danielson's representation was deficient in this case, Bounds has failed to show any prejudice as a result. Bounds argues that the conflict itself was prejudice, but this argument is foreclosed by *Beets*. 65 F.3d at 1268 ("*Strickland* did not say that prejudice is presumed whenever counsel breaches the duty of loyalty."). In *Beets*, the defendant's attorney collected a fee in the form of a media rights contract, which "posed a serious potential conflict of interest." *Id.* at 1274. Still, the court determined that the *Strickland* prejudice prong was unmet because the defendant "failed to show how [the media rights contract] hindered [the attorney's] presentation of her defense or prejudiced her by rendering the result of her criminal prosecution fundamentally unreliable." *Id.* Similarly, Bounds makes no argument about how Danielson's representation harmed his case and nothing in the trial transcript indicates that it did.

The district court also did not abuse its discretion by denying the motions for substitute counsel on the basis of a conflict of interest. The district court held multiple hearings, heard from all interested parties, and reasonably

concluded—based on the unique circumstances in this case—that Danielson could continue to provide effective representation.

### 2. Breakdown in Communication

"The court is constitutionally required to provide substitute counsel . . . if there is a . . . complete breakdown in communication." *United States v. Mitchell*, 709 F.3d 436, 441–42 (5th Cir. 2013) (cleaned up). But "reversal is inappropriate when the breakdown can be attributed to the defendant's intransigence, and not to the neglect of defense counsel or the trial court." *Simpson*, 645 F.3d at 308.

Even assuming arguendo that there was a complete breakdown in communication between Danielson and Bounds, there is no evidence that communication difficulties could be attributed to "neglect of defense counsel or the trial court." *Id.* The district court explained to Bounds that Danielson was "an excellent attorney, and if you give him a chance, he'll do you a good job. If you don't give him a chance, he'll do the best he can, but he could do a whole lot better job if you cooperate with him and listen to what he says." Additionally, Danielson met with Bounds and responded to Bounds's communications throughout the pendency of the case. Danielson responded with specificity and professionalism to Bounds's emails and clarified that while the decisions of whether to plead guilty and testify belonged to Bounds, "other tactical decisions are for your lawyer to make."

For similar reasons, the district court did not abuse its discretion by choosing not to substitute counsel based on the alleged "complete breakdown in communication." *Mitchell*, 709 F.3d at 441–42. Again, the district court held multiple hearings and heard from all interested parties, and we hold that it was reasonable to conclude that Danielson could continue to effectively represent Bounds.

No. 17-10165

B. Application of Obstruction-of-Justice Sentence Enhancement

Section 3C1.1 of the Guidelines directs a two-level increase to a defendant's offense level if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

"A finding of obstruction of justice [under U.S.S.G. § 3C1.1] is a factual finding that is reviewed for clear error." *United States v. Zamora-Salazar*, 860 F.3d 826, 836 (5th Cir. 2017). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Id.* (cleaned up). "In determining whether an enhancement applies, a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error as well." *Id.* (cleaned up).

This court has never considered application of the obstruction-of-justice sentence enhancement in a case involving repetitive requests to substitute counsel. Other circuits also have not directly addressed this issue. However, the Third Circuit affirmed application of the enhancement when the defendant—among other dishonest actions—"lied about his reasons for wanting to change counsel and the nature of his dispute with his original counsel." *United States v. Siddons*, 660 F.3d 699, 708 (3d Cir. 2011).

The lack of relevant caselaw is instructive. Requests to substitute counsel alone do not amount to obstruction of justice. A defendant's failure to work in harmony with court-appointed counsel may occur for a number of reasons, such as anxiety related to the heavy consequences of a criminal conviction, differences in personality, and incompatible communication styles. District courts must be cautious not to punish defendants for their distrust of

9

the criminal justice system or their lack of knowledge related to the procedures applied therein. District courts must also avoid applying the obstruction-of-justice sentence enhancement in a manner that will discourage defendants from actively participating in their own defenses and asserting their constitutional right to effective assistance of counsel. Indeed, application note 2 to U.S.S.G. § 3C1.1 specifically cautions that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right."

In this case, however, the district court did not base its decision to apply the obstruction-of-justice sentence enhancement on the defendant's repeated requests for substitute counsel. Instead, the district court reiterated its factual finding that Bounds intentionally obstructed justice by creating a "false, contrived conflict" with his attorney. The district court found that Bounds had taken "extraordinary steps" in order to disrupt the judicial proceedings. This factual finding was not made after the fact at the sentencing hearing to justify application of the sentence enhancement. Rather, the finding was initially made at one of several hearings on the issue of whether to substitute counsel, where the district court had the benefit of assessing the credibility of all interested parties. Given the deference afforded to factual findings, especially those based on credibility determinations, we cannot say that the district court clearly erred. Therefore, we AFFIRM.

## Herrera

Herrera appeals the district court's denial of her motion to suppress evidence obtained from a search of two cell phones found in her possession.[2] She alleges that there was no probable cause for a search warrant because the facts in the affidavit supporting the search warrant were stale and the affidavit

---

[2] Herrera also joins in Heaslet's appeal of the district court's refusal to strike witness Leslie Holliday's testimony. That issue is addressed in the next Section.

supporting the search warrant lacked any evidence establishing a nexus between her cell phones and ongoing drug activity. She also argues that the good faith exception to the exclusionary rule should not apply. We AFFIRM.

## I. Summary of Relevant Facts and Proceedings

In 2015, the DEA and Homeland Security began investigating allegations that Herrera had been distributing meth since October 2014. On June 30, 2016, she was arrested. At the time of her arrest, Herrera possessed two cell phones—an LG phone and an Alcatel phone, which the government seized.

On July 5, the government applied for a warrant to search the phones. The search warrant application contained an affidavit from Special Agent Perry Moore ("Moore"), a DEA Task Force Officer with the Fort Worth Police Department. In it, Agent Moore states that based on his knowledge, training, and expertise in investigating narcotics offenses, "drug traffickers utilize multiple cellular telephones to conduct drug trafficking business," and "communicate via traditional phone calls, and the sending/receiving of electronic communications via multimedia message service (MMS) and short message service (SMS) messages." He further states:

> In 2014, Agents/Officers received information that Nicole HERRERA was currently trafficking multiple ounce quantities of crystal methamphetamine in the Fort Worth, Texas area. Co-conspirator Sarah Kirkpatrick identified Nicole HERRERA as a methamphetamine distributor who she knew was supplying multi ounce quantities of methamphetamine to her boyfriend, another co-conspirator. Sarah Kirkpatrick stated that in 2015 on multiple occasions she traveled with her boyfriend to meet Nicole HERRERA and receive four (4) ounce quantities of methamphetamine from Nicole HERRERA. Co-conspirator Audra BOWDEN confirmed that Nicole HERRERA was involved in distributing methamphetamine. Audra BOWDEN confirmed that based on her participation in the conspiracy and through conversations that [she knew that] Sarah KIRKPATRICK and her

11

boyfriend were receiving methamphetamine from Nicole HERRERA.

The search warrant application did not report that Sarah Kirkpatrick's boyfriend, Robert Everhart ("Everhart"), was arrested in June 2015.

On June 28, 2016, a magistrate judge approved the warrant. The government searched Herrera's two phones. Prior to trial, Herrera filed a motion to suppress the text messages recovered from the phone. Her motion was denied after a hearing, and the government admitted a two-page exhibit at trial displaying some of the text messages retrieved from the LG and Alcatel phones.

## II. Analysis

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error, viewing the evidence in the light most favorable to the prevailing party." *United States v. Ganzer*, 922 F.3d 579, 583 (5th Cir. 2019) (cleaned up). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012) (quoting *United States v. Gomez*, 623 F.3d 265, 268 (5th Cir. 2010)). In cases where the government obtained a warrant, "[a] magistrate's determination of probable cause is entitled to great deference by reviewing courts." *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010).

This court considers probable cause questions in "two stages." *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). First, the court determines "whether the good-faith exception to the exclusionary rule . . . applies. If it does, [the court] need not reach the question of probable cause for the warrant unless it presents a novel question of law, resolution of which is necessary to guide future action by law enforcement officers and magistrates." *Id.* (cleaned up). Herrera does not argue that this case presents a novel question of law.

No. 17-10165

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Id.* Herrera provides two reasons why the good faith exception should not apply in this case: (1) Agent Moore's failure to inform the court that Everhart was incarcerated in June 2015 evidenced recklessness in preparing the affidavit, and (2) the warrant was based on an affidavit that was facially deficient in terms of its particularity.

The good-faith exception does not apply where the magistrate judge "was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth." *Id.* at 399–400 (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992)). Material omissions are treated similarly. *See United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995). Herrera asserts that inclusion of Everhart's arrest in the affidavit was necessary to alert the magistrate judge to the fact that Herrera's alleged participation in drug trafficking activities was not ongoing. However, nothing in the affidavit suggests that Herrera continued selling drugs to Everhart at any time after 2015. Therefore, the omission did not render the affidavit misleading.

The good-faith exception is also unavailable "where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Payne*, 341 F.3d at 399–400 (quoting *Webster*, 960 F.2d at 1307 n.4). "Bare bones affidavits typically contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) (cleaned up). The affidavit in this case was not bare bones. It included facts and circumstances from which the magistrate judge could have independently determined that probable cause

13

existed. Specifically, the affidavit named two co-conspirator witnesses (Sarah Kirkpatrick and Audra Bowden) who identified Herrera as having sold a precise quantity (four ounces) of meth on multiple occasions in a certain year, and Agent Moore explained why his experience as a narcotics officer led him to believe that Herrera's phones likely contained evidence of that drug trafficking.

Because we find that application of the good faith exception is appropriate in this case, we need not decide whether there was probable cause for the warrant.

## **Heaslet and Herrera**

Heaslet and Herrera jointly assert that the district court violated their Sixth Amendment right of confrontation by allowing witness Leslie Holliday ("Holliday") to invoke the Fifth Amendment privilege against self-incrimination after she allegedly waived it on direct examination. We AFFIRM.

### I. Summary of Relevant Facts and Proceedings

On the second day of trial, the government called co-conspirator witness Holliday to the stand. The government began by asking Holliday questions about her criminal history. She testified that she had been arrested several weeks prior with meth in her possession, that she was hoping to get a lesser charge in exchange for her cooperation, and that she had twenty or so felony convictions, largely for credit card abuse and possession of meth. Thereafter, counsel for the government proceeded to ask her about her involvement in the conspiracy.

On cross-examination, counsel for Heaslet confirmed that Holliday had "20 felony convictions." He elicited acknowledgement from Holliday that "credit card abuse is a crime of moral turpitude," and Holliday admitted that she—not "someone else"—was stealing credit cards. Then, after pressing her

14

on the value and weight of drugs involved in the deals she testified to witnessing, Heaslet's counsel asked about her own history with drugs. Holliday admitted to being "involved with" a number of transactions in which the amount of meth "far exceed[ed] 30 or 40 kilos."

Herrera's counsel also asked Holliday about her criminal history. She admitted to "lying and stealing," to receiving sentence enhancements for committing credit card offenses against the elderly, and to being "a habitual criminal." Herrera's counsel also asked her about her arrest on August 11, 2016. Holliday admitted that she was arrested in a Walmart parking lot on that day and that she had meth in her right hand at the time. She admitted that the police had searched her car and found more meth. Only when counsel asked her whether she also had a fake ID in her right hand did she ask to consult with her attorney. Holliday's attorney advised her to "plead the Fifth" regarding her pending cases. When Holliday refused to answer more questions about her arrest on Fifth Amendment grounds, Heaslet's attorney objected on Confrontation Clause grounds. Herrera's counsel joined in this objection. The district court overruled the objections.

## II. Analysis

This court reviews claims of Sixth Amendment Confrontation Clause violations de novo and subject to a harmless-error analysis. *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010). "Once the Confrontation Clause of the Sixth Amendment has been satisfied, limitation of cross-examination is reviewed for abuse of discretion." *United States v. Roussel*, 705 F.3d 184, 194 (5th Cir. 2013).

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 42 (2004). "The main and essential purpose of confrontation is to secure for the

opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). However, "[t]he district court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)). "The Confrontation Clause . . . is satisfied where defense counsel has been 'permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (quoting *Davis*, 415 U.S. at 318). To establish a Confrontation Clause violation, "the defendant need only show that 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination.'" *Templeton*, 624 F.3d at 223 (quoting *Skelton*, 514 F.3d at 439).

The record illustrates that a reasonable jury would not have had a significantly different impression of Holliday if Heaslet's attorney had been permitted to ask more questions about her August 11, 2016 arrest. The only testimony that was apparently excluded on Fifth Amendment grounds related to Holliday's possession of a fake ID. The jury heard that Holliday had received twenty felony convictions for crimes of moral turpitude, that Holliday stole credit cards and received an enhancement for targeting elderly victims, and that Holliday had a prolonged association with drug dealers. Holliday even admitted that she was a "habitual criminal." With respect to Holliday's August 11, 2016 arrest, the jury heard Holliday admit that she was holding meth, had meth in her car, and had been arrested for something. Based on all of that

No. 17-10165

information, the additional fact of fake ID criminality would not have changed the jury's perception of her. Therefore, we AFFIRM.

**Skaggs**

Skaggs appeals the district court's denial of his request for funds under the Criminal Justice Act ("CJA") to hire an investigator. He also alleges that the district court violated his Sixth Amendment rights to confrontation, compulsory process, and to present a complete defense when it barred him from asking witness Jessica Judge ("Judge") and two law enforcement witnesses about an alleged inconsistency between Judge's direct testimony and a DEA report summarizing an interview of her. Skaggs also appeals the district court's denial of his motion for acquittal. Finally, based on all of these alleged errors, Skaggs asserts that the doctrine of cumulative error should be applied. We AFFIRM.

I. Summary of Relevant Facts and Proceedings

A. Request for Funds to Hire an Investigator

Skaggs received appointed counsel under the CJA. Skaggs's attorney filed an application with the district court for CJA funds to hire a private investigator. The motion stated that an investigator could locate and investigate co-conspirators, locate and obtain relevant documents, and assess what value discovered materials might have if introduced at trial. The district court denied the motion because it failed to allege facts that would indicate a particular need for an investigator.

Skaggs's attorney then filed a Motion to Reconsider, adding the fact that counsel had a difficult time locating witness Kim Mackenzie ("Mackenzie"), an individual who was referenced in the discovery materials. The court held an ex parte telephone conference with Skaggs's attorney to discuss the motion. Skaggs's attorney stated that Mackenzie was an ex-girlfriend of Skaggs who "may have some insight, according to my client, that may be useful to him [at]

trial." When pressed on what, specifically, Mackenzie might say on Skaggs's behalf, Skaggs's attorney noted only that there were "some text messages between them that could be construed a number of different ways." He wanted to hire an investigator to go to her home in Brownwood, which he was not comfortable doing himself.

The district court ultimately denied the motion stating, "I noticed you've already filed your witness list and don't have her named on it, so apparently that's not something that has been viewed to be a crucial thing in the representation of your client." "[I]f you really [feel] like, after some further inquiry, that [Mackenzie is] a crucial witness, then I'll entertain on an ex parte basis something else you might want to file." Skaggs's attorney never filed a subsequent motion.

### B. Limitations of Cross-Examination

Judge was a government witness who interviewed with DEA agents and testified at trial in hopes of receiving a sentencing reduction. The DEA report of her interview says, "Judge identified [three redacted names] as the partners of Billy Skaggs, and as methamphetamine customers of hers. Judge stated that from April 2015 to June 2015, [three redacted names] had obtained eight (8) ounces of methamphetamine from Judge on at least three (3) occasions."

At trial, Judge testified that she met Skaggs in mid-2014. She testified that while she was living with a woman named Amanda Means ("Means"), Skaggs would come in from Brownwood to buy meth from her. She testified that the first quantity she sold to him was "maybe an ounce or two." As time progressed, according to Judge, Skaggs started buying a pound of meth from her approximately "[e]very 4 to 6 weeks." Judge testified that Skaggs continued to purchase similar amounts of meth from her with similar frequency when she moved to a new place "off of Las Vegas Trail." The next year, after Judge had changed suppliers, Skaggs continued to purchase meth from her, but "he

started only getting half a pound." Judge testified that the frequency of purchases remained the same. Judge also testified that she introduced Skaggs to Audra Bowden ("Bowden"), a supplier. She testified that the two met each other and engaged in a transaction involving a half pound of meth. Judge testified that the last time she remembered interacting with Skaggs about drugs was in the summer of 2015, but the planned transaction never actually took place.

On cross-examination, Skaggs's attorney asked Judge whether she interviewed with DEA agents, and she said she had. Rather than delve into the contents of those interviews, however, defense counsel turned to Judge's drug history. He asked about the first time she used meth, the first time she sold meth, whether she had used other drugs (including marijuana, cocaine, crack, heroin, and ecstasy), whether she had been to treatment, whether she had relapsed, and again when she began buying and selling drugs. At that point, the district court interrupted to urge defense counsel to move on. Despite the warning, defense counsel continued to ask Judge about her drug use. After being interrupted by the district court a second time, defense counsel began asking Judge about her motivation for testifying. Judge admitted that she was hoping to receive a reduced sentence in exchange for her testimony. When defense counsel asked, "You're pretty desperate to lower your sentence; is that right?" the district court told him to move on to something else. Again, defense counsel ignored the district court and continued to ask Judge about her desire to obtain a reduced sentence. The district court interrupted defense counsel for a fourth time to instruct him to move on. When defense counsel proceeded to ask Judge more questions about her motivation for testifying, the district court told defense counsel to be seated.

Later, Skaggs's attorney attempted to question DEA Agents McCurdy and Crum about Judge's interview with their agency. The district court

sustained the government's objection to these questions as outside the scope of direct. Outside the presence of the jury, Skaggs's attorney asserted that Judge had testified to "a different quantity than the amount she provided in her interview," and he wanted to impeach her.

## C. Motion for Acquittal

In addition to Judge's testimony, the government provided evidence from three other witnesses against Skaggs. Means identified Skaggs as one of Judge's "frequent" meth customers. Means testified that Skaggs purchased "larger quantities than Judge normally had," such that Judge would normally have Skaggs stay at her apartment "while she would bring it back or have someone come to the apartment and supply it." A cooperating witness named Sarah Kirkpatrick ("Kirkpatrick") also testified against Skaggs. Kirkpatrick testified that she knew Judge and met Skaggs through Judge. She testified that when Skaggs came into town to buy drugs from Judge, Judge would "get his money and then she'd go and she'd come back with [the drugs]." Finally, DEA agent Brian Finney testified against Skaggs. He primarily testified about photos of drugs that were on Skaggs's cell phone when he was arrested, including one of a large chunk of meth that "appear[ed] to be multiple ounces."

## II. Analysis

### A. Request for Funds to Hire an Investigator

This court reviews the denial of a request for CJA funds for an investigator or expert under an abuse-of-discretion standard. *United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006); *United States v. Castro*, 15 F.3d 417, 421 (5th Cir. 1994).

The Due Process Clause of the Fifth Amendment requires that a criminal trial not be fundamentally unfair. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982). "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has

No. 17-10165

access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). "To implement this principle," the Court has identified the "basic tools of an adequate defense" and has "required that such tools be provided to those defendants who cannot afford to pay for them." *Id.* (citing *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)). *Ake* announced three considerations relevant for determining which "basic tools" are required: first, "the private interest that will be affected by the action of the State"; second, "the governmental interest that will be affected if the safeguard is to be provided"; and third, "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.*

"The private interest in the accuracy of a criminal proceeding . . . is almost uniquely compelling." *Id.* at 78. Additionally, the government's financial burden here is low. Skaggs's Motion to Reconsider requested only $1,500. Nevertheless, we find that the district court did not abuse its discretion in denying the request because Skaggs failed to illustrate that the contribution of an investigator to his defense would have been anything but minimal. Even assuming that an investigator would have been able to locate Mackenzie, Skaggs did not articulate any specific insight Mackenzie might have been able to provide. We also note that Skaggs did not include Mackenzie on his witness list, and he never took up the district court's invitation to file another ex parte motion if it turned out that Mackenzie was a "crucial witness." Based on the circumstances and information available to the district court, we find no abuse of discretion and AFFIRM.

## B. Limitations of Cross-Examination

This court reviews claims of Sixth Amendment Confrontation Clause violations de novo and subject to a harmless-error analysis. *Templeton*, 624 F.3d at 223. "Once the Confrontation Clause of the Sixth Amendment has been

satisfied, limitation of cross-examination is reviewed for abuse of discretion." *Roussel*, 705 F.3d at 194.

Skaggs barely articulates an argument challenging the district court's interruption of his cross-examination of Judge, and certainly not a Sixth Amendment one. Under the abuse-of-discretion framework, this court has held that "trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Templeton*, 624 F.3d at 223 (cleaned up).

In this case, the district court interrupted Skaggs's attorney long after he had completed his brief questioning about the DEA report and well into his repetitive lines of questioning about Judge's criminal history and personal drug use. The district court gave Skaggs's attorney four separate warnings to move on to new topics, which were ignored. When the district court finally told Skaggs's attorney to sit down, he complied without objection, offering no indication that he intended to ask Judge about an inconsistency between her direct testimony and the DEA report. On this record, the district court did not abuse its discretion.

Skaggs also argues that the district court violated his Sixth Amendment rights by precluding his counsel from asking Agent McCurdy and Officer Crum about the alleged inconsistency between Judge's verbal testimony and the DEA's report of her interview. This argument fails because there is no inconsistency.

The DEA report does not discuss any statements that Judge made about Skaggs. Rather, it states that Judge "identified [three redacted names] *as the partners* of Billy Skaggs," and that "from April 2015 to June 2015," those partners "had obtained eight (8) ounces of methamphetamine from Judge on

at least three (3) occasions." Even if the report could be read as referencing Skaggs, there is still no inconsistency. On direct examination, Judge testified that when she first met Skaggs in mid-2014, she was selling "one pound" quantities to him but that "he started only getting half a pound" after he was arrested toward the end of their drug relationship, which terminated in the summer of 2015. "April 2015 to June 2015" would be an accurate characterization of the later part of a relationship that extended from mid-2014 through summer 2015. Eight ounces is "half a pound." Because there is no inconsistency, there is no impeachment value in the testimony that Skaggs was prevented from eliciting. Therefore, there was no Sixth Amendment violation. We AFFIRM.

## C. Motion for Acquittal

Because Skaggs preserved his challenge to the sufficiency of the evidence by moving for acquittal under Federal Rule of Criminal Procedure 29, this claim is reviewed de novo. *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017). This de novo review is highly deferential to the verdict. *Id.* "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

To convict Skaggs of conspiracy to possess with intent to distribute 50 grams or more of meth, 21 U.S.C. § 846, the jury was required to find that:

> (1) two or more persons agreed to possess meth with the intent to distribute it;
>
> (2) Skaggs knew of the unlawful purpose of the agreement;
>
> (3) Skaggs joined in the agreement willfully, that is, with intent to further its unlawful purpose;

23

(4) the overall scope of the conspiracy involved at least 50 grams of a mixture containing a detectable amount of meth;

(5) Skaggs knew or reasonably should have known that the scope of the conspiracy involved at least 50 grams of a mixture containing a detectable amount of meth.

*See United States v. Franklin*, 561 F.3d 398, 402 (5th Cir. 2009).

 "[A] defendant may be convicted of a conspiracy if the evidence shows that he only participated at one level of the conspiracy charged in the indictment, and only played a minor role in the conspiracy." *United States v. Posada-Rios*, 158 F.3d 832, 858 (5th Cir. 1998). "The government does not have to prove that the defendant knew all of the details of the unlawful enterprise or the number or identities of all of the co-conspirators, as long as there is evidence from which the jury could reasonably infer that the defendant knowingly participated in some manner in the overall objective of the conspiracy." *Id.* However, "the government may not prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul." *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992) (cleaned up).

Judge testified that she introduced Skaggs to Bowden, a supplier named in the indictment. Specifically, Judge explained, "I called [Bowden] and asked her if she could bring me some dope for my Brownwood people. She came and she met him." Judge testified that they engaged in a transaction involving half a pound of meth. This testimony describes an agreement between Skaggs and Bowden, a named co-conspirator, to possess with intent to distribute more than 50 grams of meth, and it, along with the other evidence admitted against Skaggs, is enough to show that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We AFFIRM.

No. 17-10165

### D. Doctrine of Cumulative Error

"'Cumulative error' justifies reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (quoting *United States v. Fields,* 483 F.3d 313, 362 (5th Cir. 2007)). Since we find that no error occurred, the doctrine is inapplicable here.

### Killough

Killough appeals the district court's calculation of the quantity of drugs attributable to him at sentencing and the substantive reasonableness of his sentence. Because there was no information containing sufficient indicia of reliability to support the district court's calculation of drugs attributable to Killough, we VACATE Killough's sentence and REMAND for resentencing.

### I. Summary of Relevant Facts and Proceedings

The presentence report ("PSR") assigned Killough a base offense level of 43, as follows:

- **38 as base offense level pursuant to U.S.S.G. § 2D1.1** because the offense was a violation of 21 U.S.C. § 846 and involved at least 45 kilograms of meth;
- **+2 pursuant to U.S.S.G. § 2D1.1(b)(1)** because a dangerous weapon was possessed;
- **+2 pursuant to U.S.S.G. § 2D1.1(b)(5)(A) and (B)** because the offense involved the importation of meth and the defendant was not subject to a mitigating role adjustment;
- **+2 pursuant to U.S.S.G. § 3C1.1** for obstruction of justice.

This calculation actually yielded a subtotal of 44, which was reduced to 43 because that is the maximum offense level under the Guidelines. Killough's criminal history category was V.  The guideline imprisonment range was life.

Killough filed a written objection to the quantity of drugs attributed to him in the PSR. The PSR held Killough accountable for 56.6 kilograms of meth.

Of that 56.6-kilogram total, 54 kilograms were attributable to Killough based on one-kilogram amounts that Killough allegedly delivered to an individual named Alicia Priest ("Priest") over a period of months. Paragraph 14 of the PSR detailed those transactions:

> From *December 4, 2013, through April 14, 2014*, Killough and an unidentified coconspirator brought 1,000 grams (1 kilogram) of methamphetamine to Priest's residence three times, each week, for a conservative total of *54,000 grams* (54 kilograms) *of methamphetamine* (3,000 grams, per week, multiplied by 18 weeks). Additionally, Priest witnessed Killough with 1/3 kilogram (333.3 grams) of methamphetamine on six to seven occasions at her residence, for a conservative total of 2,000 grams (2 kilograms) of methamphetamine (333.3 grams multiplied by six occasions). On one occasion, Killough and the unnamed coconspirator packaged 4 kilograms (4,000 grams) of methamphetamine. Killough and the unidentified male utilized Priest's residence to weigh, "breakdown," and package the kilograms of methamphetamine for distribution.

Killough's objection called attention to his pretrial stipulation with the government, which stated, in relevant part: "Kevin Killough was incarcerated locally from January 14, 2014 until April 12, 2014."

The government's response asserted, "To the extent Priest's information is incorrect as to the actual date ranges, such does not affect the reliability of her information about the defendant's drug dealing activities with Eloy Salas" (the unnamed co-conspirator). According to the government, Priest and two other witnesses—Alisha Feeney ("Feeney") and Haldon Stikeleather ("Stikeleather")—"generally describe the same distribution activity involving Eloy Salas ("Salas"), the defendant, and others, including the general timeframe of between Fall 2013 and January 2014." The government contended, "[T]he activity itself is corroborated when read in context with the information provided by Feeney and Stikeleather."

No. 17-10165

The probation officer filed an addendum to the PSR acknowledging the defendant's objection but adopting the government's response.

At the sentencing hearing, Killough's attorney renewed his objection to paragraph 14 of the PSR. The district court stated, "The probation officer accepted that objection in part and corrected the dates, so I think that takes care of that objection." The district court explained, "Obviously those dates in the Presentence Report, paragraph 14, are incorrect dates and . . . somebody's memory was defective on the date . . . But otherwise, the allegations in paragraph 14 are consistent with the other information, so I'm going to overrule that objection."

Ultimately, the district court sentenced Killough to life imprisonment, and Killough objected to the sentence as substantively unreasonable.

## II. Analysis

"Sentences based upon erroneous and material information or assumptions violate due process." *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. 1981). "The district court's calculation of the quantity of drugs involved in an offense is a factual determination." *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005) (quoting *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998)). "Factual findings regarding sentencing factors are entitled to considerable deference and will be reversed only if they are clearly erroneous." *Id.* (cleaned up). "The proper remedy where a trial court relies upon erroneous information or assumptions is to remand to the district court for a new sentencing hearing." *Tobias*, 662 F.2d at 388.

A district court "may extrapolate the quantity [of drugs] from any information that has sufficient indicia of reliability to support its probable accuracy." *United States v. Dinh*, 920 F.3d 307, 313 (5th Cir. 2019) (quoting *United States v. Valdez*, 453 F.3d 252, 267 (5th Cir. 2006)). "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the

sentencing judge in making factual determinations.'" *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (quoting *United States v. Nava,* 624 F.3d 226, 231 (5th Cir. 2010)). However, "mere inclusion in the PSR does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing." *Id.* at 230 n.2. "If the factual recitation in the PSR lacks sufficient indicia of reliability, then it is error for the district court to consider it at sentencing." *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) (cleaned up). Contrariwise, "[w]hen faced with facts contained in the PSR that are supported by an adequate evidentiary basis with sufficient indicia of reliability, a defendant must offer rebuttal evidence demonstrating that those facts are 'materially untrue, inaccurate or unreliable.'" *Harris*, 702 F.3d at 230 (quoting *United States v. Huerta,* 182 F.3d 361, 364–65 (5th Cir. 1999)).

In this case, the PSR stated that "from *December 4, 2013, through April 14, 2014*, Killough . . . brought 1,000 grams (1 kilogram) of methamphetamine to Priest's residence three times, each week, for a conservative total of *54,000 grams* (54 kilograms) *of methamphetamine* (3,000 grams, per week, multiplied by 18 weeks)." Both parties, and the district court, agree that that statement is false. Killough was incarcerated from January 14, 2014 until April 12, 2014—more than 67% of the time that the PSR said he was bringing meth to Priest's residence. This patently incorrect statement cannot form the basis of a drug-quantity estimate.

The government's assertion that there was, nevertheless, a plausible factual basis for concluding that Killough possessed those 54 kilograms of meth is perplexing. The government cites the following facts to support that claim:

- "Killough and Salas used Alicia Priest's residence to weigh, 'breakdown,' and package kilogram quantities of methamphetamine for redistribution";

- "Killough and Salas came to Priest's residence between 20 and 30 times, and they were 'always together'";
- "Killough and Salas brought one-kilogram quantities of methamphetamine to her home three times a week for repackaging."

The first and third bullet points are pieces of information that Priest gave in describing the December 4, 2013 to April 14, 2014 period—that is, the period of time substantially overlapping with the period of time during which Killough was incarcerated (January 14, 2014 to April 12, 2014). The second bullet point refers to an unspecified period of time. Accordingly, these additional facts are inapposite to the question of whether there is other evidence establishing that Killough possessed 54 kilograms of meth.

The government also argues that the "statements of Alisha Feeney and Haldon Stikeleather" support the PSR's 54-kilo estimate. Crediting all of these statements pertaining to Killough in the DEA investigation report, however, only yields evidence of 109.125 ounces. No evidence identified to us, aside from Priest's unreliable estimate, accounts for the remaining 50.91 kilograms.

This court dealt with a somewhat analogous situation in *United States v. Rogers*, 1 F.3d 341 (1993). In that case, the PSR attributed one pound of amphetamine to the defendant based on statements of confidential informants who purported to see the defendant with drugs on dates when the defendant was incarcerated. *Id.* at 344. However, reducing the amount of drugs attributed to the defendant by one pound would not have resulted in any change in the base offense level and sentencing guidelines. *Id.* at 343. Therefore, the court only considered the question of whether the discrepancy cast doubt on all of the statements in the PSR that were obtained from confidential informants. *Id.* at 343–44. Because the discrepancy did not directly impact the report of approximately 45 ounces—the vast majority of drugs attributed to the defendant—by one confidential informant, the defendant's own version of events corroborated that report of 45 ounces, and the extensive government

investigation corroborated many of the other details of the drug distribution scheme, the court found no clear error. *Id.* at 344. Here, the patently incorrect statement in the PSR standing alone accounts for a meaningful amount of the total drugs attributed to Killough. Because patently incorrect statements necessarily "lack[] sufficient indicia of reliability, [] it is error for the district court to consider [them] at sentencing." *Zuniga*, 720 F.3d at 591 (cleaned up). Corroboration of other aspects of the drug distribution scheme by the government's investigation does not change this analysis.

Since there is no information with sufficient indicia of reliability to support the district court's conclusion that 56.6 kilograms of meth should be attributed to Killough, this finding constituted clear error. Consequently, we VACATE Killough's sentence and REMAND for resentencing. In light of this holding, we need not address Killough's alternative claim that his sentence is substantively unreasonable.

## Gentry

Gentry appeals the district court's denial of his motion for acquittal. He also argues that the district court erred in calculating the quantity of drugs attributable to him at sentencing, and he appeals the district court's application of two sentence enhancements—one for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1) and one for the importation of drugs under U.S.S.G. § 2D1.1(b)(5). We AFFIRM.

### I. Summary of Relevant Facts and Proceedings

The PSR assigned Gentry a base offense level of 40, as follows:

- **36 as base offense level pursuant to U.S.S.G. § 2D1.1** because the offense was a violation of 21 U.S.C. § 846 and involved between at least 15 kilograms and less than 45 kilograms of meth;
- **+2 pursuant to U.S.S.G. § 2D1.1(b)(1)** because a dangerous weapon was possessed;

- **+2 pursuant to U.S.S.G. §§ 2D1.1(b)(5)(A) and (B)** because the offense involved the importation of meth and the defendant was not subject to a mitigating role adjustment.

Gentry's criminal history category was III. The resulting guideline imprisonment range was 360 months to life. However, because the statutorily authorized maximum sentence is 40 years, the applicable guideline sentencing range became 360 to 480 months.

The PSR attributed 24.21 kilograms of meth to Gentry based on the following interactions:

- Between 2011 and February 2014, Shanda Hawkins ("Hawkins") and R.V. Kerr delivered one ounce of meth to Gentry daily, resulting in approximately 772 ounces of meth;
- Sometime after February 2014, Hawkins, Gavin Seguin, and Edwin Romine delivered four ounces of meth to Gentry on two occasions, two ounces of meth to Gentry on 20-25 occasions, one ounce of meth to Gentry on ten occasions, and half an ounce of meth to Gentry on 15-20 occasions, resulting in 70.5 ounces of meth;
- On two unspecified occasions, Silton Goutreaux supplied Gentry with two ounces and a half ounce of meth, respectively, resulting in 2.5 ounces of meth;
- On four unspecified occasions, Gentry received one ounce of meth from Tonya Blackwood ("Blackwood"), resulting in four ounces of meth;
- From late 2015 to 2016, Leslie Payne ("Payne") supplied Gentry with two ounces of meth on one occasion, one ounce of meth on one occasion, and a half ounce of meth on three occasions, resulting in 4.5 ounces of meth;
- In late 2015 or early 2016, Gentry obtained a half ounce of meth from an unidentified coconspirator and one-sixteenth an ounce of meth from William Orozco, resulting in 0.5625 ounces of meth.

Application of the dangerous weapon sentence enhancement was based on statements of three individuals who observed Gentry with a firearm. Payne observed Gentry with a firearm on one occasion; Candace Whitten ("Whitten") observed Gentry use a firearm in conjunction with meth distribution; and

Tiffany Bradberry, who observed Gentry in possession of meth on at least 20 occasions, also observed the defendant possess a firearm.

The importation sentence enhancement was supported by the following statement in the PSR addendum:

> During the investigation of Hawkins and Blackwood, agents identified their sources of supply which distributed methamphetamine that had been imported from Mexico. The offense involved the distribution of methamphetamine, and the importation of methamphetamine from Hawkins's and Blackwood's sources of supply was in furtherance of the criminal activity.

Gentry filed a written objection to the quantity of drugs attributed to him, application of the dangerous weapon sentence enhancement, and application of the importation sentence enhancement. Specifically, he objected that the calculation of meth attributed to him and the application of the sentence enhancements were based on unsupported co-defendant statements. He also noted that he was incarcerated at various times between January 2014 and April 2016.

The probation officer filed an addendum to the PSR acknowledging that Gentry was incarcerated for at least five months from June to November 2013, a time during which the PSR attributed 150 ounces of meth to him. Subtracting these 150 ounces of meth reduced the total amount of meth attributed to Gentry to 20 kilograms, still resulting in a base offense level of 36.

At sentencing, Gentry renewed his written objections to the PSR. When the district court asked whether he had any evidence he wanted to offer, he said no. The district court then overruled the objections and adopted the findings in the PSR and PSR addendum.

No. 17-10165

## II. Analysis

### A. Motion for Acquittal

Gentry raises this claim via a heading in his brief but provides no substantive argument on the issue. "Failure of an appellant to properly argue or present issues in an appellate brief renders those issues abandoned." *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992). This is the case when an appellant "fails . . . to make *any argument whatsoever* to support [the] contention" that the evidence was insufficient to support the conviction. *Id.* Gentry has abandoned this claim.

### B. Calculation of Drugs Attributable to Gentry at Sentencing

As previously discussed, "[t]he district court's calculation of the quantity of drugs involved in an offense is a factual determination" reviewed for clear error. *Betancourt*, 422 F.3d at 246 (quoting *Alford*, 142 F.3d at 831). "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'" *Harris*, 702 at 230 (quoting *Nava,* 624 F.3d at 231). "When faced with facts contained in the PSR that are supported by an adequate evidentiary basis with sufficient indicia of reliability, a defendant must offer rebuttal evidence demonstrating that those facts are 'materially untrue, inaccurate or unreliable.'" *Id.* at 230 (quoting *Huerta,* 182 F.3d at 364–65).

Gentry's argument that the calculation of meth attributable to him is erroneous because it relies on uncorroborated statements made by co-defendants who did not testify at trial is unconvincing. The district court may consider any "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

At oral argument, Gentry further argued that certain statements in the PSR attributing drugs to him are unreliable because the individuals responsible for them also attributed drugs to Gentry at times when he was incarcerated. The PSR addendum subtracted the 150 ounces of meth attributed to Gentry in the original PSR at times when he was incarcerated. To the extent that Gentry now disputes the reliability of other drug attribution statements not directly undermined by his incarceration, his broad objections re-urged at the sentencing hearing and supported by no evidence were insufficient to "demonstrate[] that those facts [were] 'materially untrue, inaccurate or unreliable.'" *Harris*, 702 F.3d at 230 (quoting *Huerta,* 182 F.3d at 364–65); *see also United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010) (finding that objections are not evidence sufficient to rebut information in the PSR containing sufficient indicia of reliability); *United States v. Thomas*, 57 F. App'x 212, 2003 WL 151204, at *2–*3 (5th Cir. 2003). Finding no clear error, we AFFIRM.

C. Application of Dangerous Weapon Sentence Enhancement

U.S.S.G. § 2D1.1(b)(1) allows for a two-level increase in the base offense level "[i]f a dangerous weapon (including a firearm) was possessed." "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A).

The decision to apply U.S.S.G. § 2D1.1(b)(1) is a factual one, reviewed only for clear error. *United States v. Eastland*, 989 F.2d 760, 769 (5th Cir. 1993). "The district court's legal interpretation of the Guidelines are reviewed de novo." *United States v. Paulk*, 917 F.2d 879, 882 (5th Cir. 1990) (cleaned up). The district court may consider any "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that

the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

Here, the district court properly adopted the findings in the PSR and PSR addendum, including Whitten's observation of Gentry using "a firearm in conjunction with methamphetamine distribution." This was sufficient to support application of U.S.S.G. § 2D1.1(b)(1). *See Paulk*, 917 F.2d at 882. We AFFIRM.

D. Application of Drug Importation Sentence Enhancement

U.S.S.G. § 2D1.1(b)(5) instructs courts to increase the base offense level by two if "the offense involved the importation of methamphetamine . . . ." It applies "when the offense involved the importation of methamphetamine, even if the defendant did not know that the methamphetamine was imported." *United States v. Serfass*, 684 F.3d 548, 554 (5th Cir. 2012) (cleaned up).

In applying U.S.S.G. § 2D1.1(b)(5), the district court's legal interpretations of the Guidelines are reviewed de novo, and its factual findings are reviewed for clear error. *Id.* at 550. The district court may consider any "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

This court has previously found evidence similar to that present in this case sufficient to uphold application of the enhancement. *See United States v. Piper*, 912 F.3d 847, 860 (2019) (upholding application of the enhancement against Piper based on a DEA finding that Rosales received meth imported from Mexico and Piper bought large quantities of meth from Rosales). We AFFIRM.

No. 17-10165

**Short**

Short appeals the district court's denial of his motion for acquittal and the district court's calculation of the quantity of drugs attributable to him at sentencing. We AFFIRM.

I. Summary of Relevant Facts and Proceedings

A. Motion for Acquittal

The evidence presented against Short at trial primarily consisted of the testimony of two witnesses: Holliday and Royce Newton ("Newton"). Holliday testified that she met Short in August 2015 and they began to have a romantic relationship. She testified that they lived together in various hotels, and when she first began living with Short, he was receiving and distributing one to three ounces of meth consistently. Holliday also testified that during her time with Short, Heaslet, Newton, and Short—all members of the Aryan Brotherhood of Texas—would meet up about every other day to put money together for a couple kilograms of drugs. Holliday was often present and watched them count the money, up to $35,000. She testified that she and Short broke up in December 2015.

Newton testified that he met Short in June or July of 2015. He testified that he would meet up with Short, primarily at hotels, to get large quantities of drugs by pooling money. They started out getting half a kilogram, but later, they would put enough money together for a full kilogram.

B. Calculation of Drugs Attributable to Short at Sentencing

The PSR assigned Short a base offense level of 43, as follows:

- **38 as base offense level pursuant to U.S.S.G. § 2D1.1** because the offense was a violation of 21 U.S.C. § 846 and involved at least 90,000 kilograms of meth;
- **+2 pursuant to U.S.S.G. § 2D1.1(b)(5)** because the offense involved imported marijuana;

- **+2 pursuant to U.S.S.G. § 2D1.1(b)(12)** because the defendant maintained premises for the purpose of manufacturing or distributing a controlled substance;
- **+2 pursuant to U.S.S.G. § 2D1.1(b)(1)** for possession of a dangerous weapon in connection with the offense.

This calculation actually yielded a subtotal of 44, which was reduced to 43 because that is the maximum offense level under the Guidelines. Short's criminal history category was V, and the guideline imprisonment range was life.

The PSR held Short accountable for 62.3 kilograms of meth and six gallons of gamma-Hydroxybutric acid ("GHB"). The meth consisted of the following:

- Three kilograms that Short received in one-kilogram quantities on three to four occasions from Shawn Cropp ("Cropp") and Stephanie Hatley ("Hatley") and 737.1 grams that Short, Payne, Cropp, Bounds, and an unknown female "broke down" in a hotel room in Fort Worth;
- 2.7 kilograms that Short received in three- to six-ounce quantities daily from Jose Pablo Morales ("Morales") through Herrera during a three- to four-week period beginning in September 2015;
- 52.5 kilograms that Short, Ashley Simpson ("Simpson"), Cropp, Hatley, Heaslet, Brittany Tylka, and Newton received in three- to four-kilogram quantities every other day from Herrera and Morales for over one month;
- 3.4 kilograms that he received in 1.5-pound quantities from Douglas Faulk on five occasions in October 2015.

The GHB consisted of six gallons Eric Overstreet observed Short and Simpson in possession of on one occasion. Short filed a written objection to the quantity of drugs attributed to him. Specifically, he objected that the calculations were based on "approximate time periods and unknown locations."

No. 17-10165

## II. Analysis

### A. Motion for Acquittal

Short, like Skaggs, preserved his challenge to the sufficiency of the evidence by moving for acquittal under Federal Rule of Criminal Procedure 29. Therefore, we review this claim de novo. *Oti*, 872 F.3d at 686. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson,* 443 U.S. at 319).

To convict Short of conspiracy to possess with intent to distribute 50 grams or more of meth, 21 U.S.C. § 846, the jury was required to find that:

> (1) two or more persons agreed to possess meth with the intent to distribute it;
>
> (2) Short knew of the unlawful purpose of the agreement;
>
> (3) Short joined in the agreement willfully, that is, with intent to further its unlawful purpose;
>
> (4) the overall scope of the conspiracy involved at least 50 grams of a mixture containing a detectable amount of meth;
>
> (5) Short knew or reasonably should have known that the scope of the conspiracy involved at least 50 grams of a mixture containing a detectable amount of meth.

*See Franklin*, 561 F.3d at 402.

Short first argues that he is entitled to an acquittal because "the government offered self-serving testimony of methamphetamine addicts and dealers who had entered guilty pleas and gave testimony in hopes of receiving lenient sentences." This argument is misplaced. "The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)). Even

"uncorroborated testimony of an accomplice or of someone making a plea bargain with the government" can support a conviction, "provided that the testimony is not incredible or otherwise insubstantial on its face." *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014).

Next, Short argues that the testimony against him was insufficient to connect him with the timeline of the alleged conspiracy. This assertion is not supported by the record. Holliday testified that between August 2015 and December 2015, Short (1) sold 1-3 ounces of meth consistently and (2) pooled money with other individuals to purchase drugs amounting to at least a couple kilograms. Newton also testified that beginning in June or July 2015, he would pool money with Short and other individuals to purchase large quantities of drugs. This testimony is sufficient to connect him to the conspiracy starting "in or before January 2014 and continuing until in or around April 2016."

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that Short committed the essential elements of the crime beyond a reasonable doubt. We AFFIRM.

B. Calculation of Drugs Attributable to Short at Sentencing

As previously discussed, "[t]he district court's calculation of the quantity of drugs involved in an offense is a factual determination" reviewed for clear error. *Betancourt*, 422 F.3d at 246 (quoting *Alford*, 142 F.3d at 831). The district court "'may extrapolate the quantity [of drugs] from any information that has sufficient indicia of reliability to support its probable accuracy,' and 'may consider estimates of the quantity of drugs for sentencing purposes.'" *Dinh*, 920 F.3d at 313 (quoting *Valdez*, 453 F.3d at 267).

Short objects to the district court's reliance on information involving approximate time periods and unknown locations. Like Gentry, he failed to present any evidence at sentencing to support his objections. Because it was

not clear error for the district court to rely on the information in the PSR, we AFFIRM.

## Conclusion

Killough's sentence is VACATED, and his case is REMANDED to the district court for resentencing. On all other issues, we AFFIRM.