# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2021

Lyle W. Cayce
Clerk

No. 19-11252

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ANTHONY HERMAN LUCIO,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:19-CR-174-1

Before STEWART, DUNCAN, and WILSON, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

Anthony Herman Lucio pleaded guilty of dealing methamphetamine. On appeal, he contests only how much meth should inform his sentence. Lucio's presentence report estimated the amount based on his cryptic texting with another dealer, illumined by testimony from Lucio's co-conspirator and a drug enforcement agent. The district court accepted those findings, a decision to which we generously defer. We AFFIRM.

No. 19-11252

# I

Lucio was charged with conspiring to distribute methamphetamine ("meth"), in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). The charge arose from a series of events that occurred between December 2018 and February 2019. After receiving a tip from a confidential source, law enforcement arranged to buy about three ounces of "ice"[1] from Lucio in two controlled transactions. Lucio told the source he would sell a kilogram of "ice" for $6,500. Shortly thereafter, officers arrested Lucio on an active felony warrant and searched his residence pursuant to a search warrant. They also arrested two other men seen leaving the home: Murrell Wilson, who is Lucio's uncle-in-law, and Ramiro Cantu. The search of the residence revealed meth, cocaine, marijuana, firearms, and over $16,000 in cash. The officers also found marijuana in a vehicle and $1,800 in Cantu's possession.

Wilson made a statement after his arrest. He told officers that he lived with Lucio, that Lucio was a drug dealer, and that he delivered meth, cocaine, and marijuana for Lucio in lieu of rent payments. Not only had he personally delivered two to three ounces of meth to an unknown individual on one occasion, but he and Lucio had also obtained two to three pounds of the substance a month before their arrests. He identified four occasions when

---

[1] The United States Sentencing Guidelines define "ice" as "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S. SENT'G GUIDELINES MANUAL § 2D1.1(c) note C (U.S. SENT'G COMM'N 2018). The type and quantity (measured by weight) of drugs involved in the offense impacts the penalty assessed. In general, "the weight of a controlled substance set forth in the [Drug Quantity Table] refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." *Id.* note A. When the substance is mixed, only the weight of the controlled substance itself is counted. Thus, "methamphetamine (actual)" refers to "the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing [methamphetamine] at 50% purity contains 5 grams of [methamphetamine] (actual)." *Id.* note B.

No. 19-11252

Lucio received ten kilograms of "ice" and a fifth when Lucio received one kilogram. Finally, Wilson asserted Lucio had stored forty-eight kilograms of "ice" in a relative's storage shed. Lucio stated, however, that none of the narcotics or firearms found at his residence belonged to him.

Officers obtained a warrant for Lucio's cell phone and found a text message conversation between him and an unidentified person. The conversation discussed "24 or 25" units of "food" that were ready for Lucio to pick up at McDonald's. This is the relevant portion of the conversation, translated from Spanish:

> **Unidentified Person**: Yes everything [is] good here, what time do I take you the food? [D]o you have the paper because I want to give it to that guy.
>
> **Lucio**: How many of them are there[?]
>
> **Unidentified Person**: 24 or 25.
>
> [Later, the two arranged to meet at a McDonald's. Shortly thereafter, the unidentified person sent the following texts:]
>
> **Unidentified Person**: Everything good or what cousin[?] . . . [S]end me a text when you arrive to your house . . . Cousin . . . how does it look cousin[?]

The officer who conducted the search interpreted this as a negotiation for twenty-four or twenty-five kilograms of meth.

Lucio pleaded guilty of conspiracy to possess with intent to distribute a controlled substance. Before sentencing, the Probation Office prepared a presentence investigation report ("PSR") that calculated the quantity of drugs attributable to Lucio. By the PSR's calculations, Lucio was accountable for 109,294.25 kilograms of converted drug weight.[2] This total included:

---

[2] When different controlled substances are involved, courts use the Drug Conversion Tables in the Sentencing Guidelines to obtain a single offense level. *See* U.S. SENT'G

- 0.08333 kilograms and 0.08335 kilograms of "ice" that Lucio sold to an undercover officer and a confidential source in two separate controlled transactions;

- 0.619 kilograms of meth, 1.27 kilograms of cocaine, and 1.63466 kilograms of marijuana seized from Lucio's home;

- 0.6237 kilograms of marijuana seized from a vehicle;

- 24 kilograms of meth involved in a transaction with an unknown person;

- and 2.83 kilograms of "ice," an amount derived by converting $18,368 seized from Lucio and Cantu to the amount of meth the money would buy, using Lucio's stated price of $6,500 per kilogram.

The PSR converted the amounts of the various drug types into a converted drug weight equivalent, pursuant to the Guidelines, to reach a single base offense level of 38 and a total offense level of 41 after enhancements and reductions. That total, paired with a criminal history category of III, resulted in a recommended Guidelines range of 360 to 480 months.

Lucio made two objections to the PSR relevant to this appeal. First, he objected to attributing twenty-four kilograms of meth to him based on the text conversation. The cryptic conversation, he contended, did not suggest the type or quantity of drugs involved (or even whether drugs were involved at all) and therefore the PSR's calculations were "bald speculation." Second, he asserted that the Government had no basis to conclude that the $18,368 in seized cash represented proceeds from the sale of "ice." Lucio moved for a below-Guidelines sentence. The Government countered that Wilson's

GUIDELINES MANUAL § 2D1.1, cmt. n.8 (U.S. SENT'G COMM'N 2018). One gram of methamphetamine is equivalent to two kilograms of converted drug weight while one gram of methamphetamine "ice" equates to twenty kilograms of converted drug weight.

statements supported both the officer's interpretation of the texts as a meth deal and the conclusion that the cash was the proceeds of meth trafficking. It also pointed to an addendum to the PSR, which included Wilson's statements about Lucio's drug dealing. Finally, it referenced a Drug Enforcement Administration report containing an agent's parsing of the text conversation. Interpreting the "24 or 25" and "food" references, the agent explained he

> believe[d] that [the unidentified person] [wa]s telling [Lucio] that the term food [wa]s utilized to describe methamphetamine and that the paper [wa]s a term utilized to describe currency. [The unidentified person] [wa]s telling [Lucio] what time he/she should deliver 24 or 25 kilograms of methamphetamine and [wa]s inquiring if [Lucio] has currency on hand.

At sentencing, the district court adopted the PSR's fact findings, overruling Lucio's objections. Nonetheless, the court granted a downward variance. The court disagreed with the Guidelines' disparate treatment of "ice" relative to "plain" meth, finding these differences "arbitrary and almost always productive of sentences greater than necessary." The court thus treated all the meth involved as "plain," resulting in a much lower converted drug weight of 55,474.25 kilograms and correspondingly lower base and total offense levels of 36 and 39, respectively. Lucio's new Guidelines range was 324 to 405 months. The court imposed a sentence of 324 months' imprisonment, the low end of the range.

Lucio timely appealed. The only issue presented is whether the district court erred in calculating the drug quantity attributable to Lucio.

## II

The district court's calculation of drug quantity is a factual determination we review for clear error. *United States v. Arayatanon*, 980 F.3d 444, 451 (5th Cir. 2020) (citing *United States v. Betancourt*, 422 F.3d

240, 246 (5th Cir. 2005)). As a fact finding, the calculation is "entitled to considerable deference" and will not be reversed "as long as it is plausible in light of the record as a whole." *United States v. Koss*, 812 F.3d 460, 466 (5th Cir. 2016) (cleaned up); *see also United States v. Kearby*, 943 F.3d 969, 974 (5th Cir. 2019) ("[W]e will not set [a drug quantity calculation] aside unless it was implausible in light of the whole record.").

## III

Lucio challenges two distinct findings in the district court's drug quantity calculation: (1) that he trafficked twenty-four kilograms of meth on the occasion described in the text messages, and (2) that the seized cash derived from the sale of 2.83 kilograms of "ice." The district court adopted these findings from the PSR, relying on the PSR itself, the addendum, and supporting documents. Lucio argues those facts were insufficiently reliable for sentencing purposes.

"Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (cleaned up). Yet "mere inclusion in a PSR" does not *ipso facto* validate facts that "lack[] an adequate evidentiary basis." *Id.* at n.2. That is, facts in a PSR still must bear "sufficient indicia of reliability" for the district court to consider them at sentencing. *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013). For instance, a PSR is reliable when "based on the results of a police investigation, especially where the offense report is detailed and includes information gathered from interviews with the victim and any other witnesses." *United States v. Fields*, 932 F.3d 316, 320 (5th Cir. 2019) (cleaned up); *see also United States v. Fuentes*, 775 F.3d 213, 220 (5th Cir. 2014) (PSR supported by police reports was reliable). Similar reliability may come from a lab report, *United States v. Dinh*, 920 F.3d 307, 313 (5th Cir. 2019), an

independently-corroborated account by a co-conspirator, *Zuniga*, 720 F.3d at 592, or a defendant's own post-arrest, Mirandized admission, *United States v. Barfield*, 941 F.3d 757, 763–64 (5th Cir. 2019). "Even uncorroborated hearsay evidence may be sufficiently reliable," under some circumstances. *United States v. Gaytan*, 74 F.3d 545, 558 (5th Cir. 1996) (uncorroborated portions of testimony were sufficiently reliable when other portions were corroborated and witness was subject to cross-examination); *see also Kearby*, 943 F.3d at 974 (citation omitted) ("If uncorroborated hearsay is sufficiently reliable, a district court may rely on it in making sentencing findings."). Even so, "bald, conclusionary statements in a PSR are not sufficiently reliable." *Zuniga*, 720 F.3d at 591 (cleaned up). And "patently incorrect" statements in a PSR "cannot form the basis of a drug-quantity estimate." *United States v. Gentry*, 941 F.3d 767, 788 (5th Cir. 2019) (discounting statements that attributed drug quantities delivered while defendant was incarcerated).

With that background in mind, we address in turn the two findings Lucio contests on appeal.

**A**

First, Lucio contends the text messages fail to prove that the transaction was drug-related at all, let alone that "food" referred to meth or that "24 or 25" referred to kilograms. Even assuming the subject was drugs, Lucio claims the drugs were not necessarily meth: the "food" on offer at McDonald's that day might instead have been cocaine or marijuana. As Lucio points out, "[l]aw enforcement found sizeable quantities of cocaine and marijuana in [his] home the day after this mystery transaction took place." Further, the texts did not specify the unit of weight, and Lucio argues the record shows he trafficked only in small quantities. Finally, officers searched his home one day after the "24 or 25"-unit purchase but found only 619 grams of meth.

The Government responds that the record as a whole gives "ample reasons" to interpret the text messages as referring to kilograms of meth. It points out that the "coded words" in the text messages "disguise that they are discussing a drug transaction" and that both the "urgency" of the messages and the unidentified person's follow-up texts are common features in drug-related communications. Moreover, the record shows not only that Lucio was a meth dealer, but also that he trafficked in kilogram quantities. While Lucio had sold smaller amounts of meth in controlled transactions, he had also named a price for a kilogram of "ice." And Wilson stated that he had witnessed Lucio "engage in multiple kilogram-quantity transactions of methamphetamine" and also that Lucio kept forty-eight kilograms of the narcotic in a relative's shed. Taken together, the Government maintains, these facts allow the conclusion that the texts referred to a twenty-four- or twenty-five-kilogram meth transaction.

Giving considerable deference to the district court's fact finding—as we must—we reject Lucio's argument that its drug quantity calculation was "implausible in light of the whole record." *Kearby*, 943 F.3d at 974. Three facts in particular support attributing to Lucio twenty-four kilograms of meth from the text transaction. First, Lucio was a meth dealer: he pleaded guilty of a meth distribution conspiracy and was directly observed by officers selling meth during controlled buys. Lucio himself quoted the price for a kilogram of "ice." Second, Lucio's co-conspirator, Wilson, stated that Lucio bought and sold meth in kilogram quantities on multiple occasions and, moreover, had stored in a shed nearly double the amount of meth involved in the text transaction. *See id.* at 974, n.3 ("[T]he court can consider statements of coconspirators . . . in calculating drug quantity." (citing *United States v. Rico*, 864 F.3d 381, 386 (5th Cir. 2017); *United States v. Cantu-Ramirez*, 669 F.3d 619, 629 (5th Cir. 2012); *Alford*, 142 F.3d at 832)). Third, the agent who reviewed Lucio's text messages applied his own training and experience to

interpret the exchange in light of Lucio's criminal history. *See United States v. King*, 773 F.3d 48, 53 (5th Cir. 2014) (PSR sufficiently reliable when probation officer "cited several investigative methods used" to prepare it); *United States v. Quintanar*, 777 F. App'x 706, 709 (5th Cir. 2019) (PSR drawn from police reports deemed reliable). Given this evidence, the district court could have plausibly concluded that the "food" in the texts referred to meth (and not cocaine, marijuana, or cheeseburgers), and that the "24 or 25" referred to kilograms (and not grams or ounces or pounds).

It is true, as Lucio points out, that the supporting evidence here is somewhat weaker than in other cases where we have upheld a district court's fact finding at sentencing. We have affirmed a district court's reliance on statements by confidential informants, for instance, when officers testified that confidential informants were reliable witnesses and corroborated their statements. *United States v. Young*, 981 F.2d 180, 187 (5th Cir. 1992). Nonetheless, we conclude the evidence here was sufficiently reliable. We have explained that a witness's partially corroborated testimony satisfied the "sufficient indicia of reliability" standard despite "[t]he fact that portions of [his] testimony [we]re uncorroborated." *Gaytan*, 74 F.3d at 558. Thus, the district court reasonably relied on Wilson's partially corroborated statements about the details of Lucio's meth-dealing. And our deference to a district court is such that its determinations will stand even if supported by "somewhat imprecise" statements of a co-conspirator who testified as to "estimates rather than exact figures" of drug quantity. *Alford*, 142 F.3d at 832; *see also Kearby*, 943 F.3d at 974 (cleaned up) ("A district court may consider estimates of the quantity of drugs for sentencing purposes.").

Moreover, our precedent permits a district court to use reasonable extrapolation in assessing attributable drug quantities. *See Kearby*, 943 F.3d at 975, n.5 (discussing "extrapolation" approach in *Betancourt*, 422 F.3d at 246–48); *see also, e.g.*, *Gentry*, 941 F.3d at 788 ("A district court 'may

extrapolate the quantity [of drugs] from any information that has sufficient indicia of reliability to support its probable accuracy.'" (quoting *Dinh*, 920 F.3d at 313)). For instance, in *Betancourt*, the defendant supplied cocaine to a dozen dealers in addition to an individual named Esparza, who later became a government witness. 422 F.3d at 243–44. Betancourt's PSR calculated drug quantity by estimating the cocaine sold to Esparza and multiplying it by twelve. *Id.* at 246. Betancourt argued that the quantity was too high because the record showed he interacted with Esparza more than any of the others. We declined to reverse the district court's drug quantity finding: "While we acknowledge[d] that the evidence did show that Betancourt had more contact with Esparza than with the others, such evidence [wa]s not a sufficient basis for this Court to reverse the determination below in light of the 'wide latitude' we give the district court in our review for clear error." *Id.* at 248 (quoting *United States v. Cothran*, 302 F.3d 279, 287 (5th Cir. 2002)); *see also Arayatanon*, 980 F.3d at 451–52 (holding that "the drug-quantity determination in the PSR is sufficiently reliable even if based on a coconspirator's 'imprecise' testimony" (quoting *Alford*, 142 F.3d at 832)).

Finally, Lucio has not presented any evidence to the contrary. "A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence." *Alford*, 142 F.3d at 831–32 (citing *United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir. 1994)). Lucio adduced no evidence to contextualize the text transaction, to counter Wilson's statements, or to rebut anything else in the PSR. "When faced with facts contained in the PSR that are supported by an adequate evidentiary basis with sufficient indicia of reliability, a defendant must offer rebuttal evidence demonstrating that those facts are materially untrue, inaccurate or unreliable." *Gentry*, 941 F.3d at 791 (cleaned up). Lucio failed to meet that burden.

In sum, we conclude that the district court did not clearly err in attributing to Lucio twenty-four kilograms of meth from the text transaction.

**B**

Second, Lucio contests the district court's conversion of cash seized from Lucio's residence and from Cantu into a corresponding amount of meth. Lucio correctly concedes that the district court was permitted to convert the money into a corresponding quantity of drugs. *United States v. Haines*, 803 F.3d 713, 743 (5th Cir. 2015) ("The district court did not err in converting the cash into a drug quantity."). Nor does he contest on appeal the conclusion that the $18,368 represented drug proceeds. Rather, Lucio maintains it was error to determine it was the proceeds of the sale of meth instead of another narcotic. He notes that officers discovered not only meth in his house, but also cocaine and marijuana; therefore, the cash could have come from selling *those* drugs. In response, the Government reiterates that the evidence shows Lucio engaged in meth trafficking. Further, it argues he "would be hard pressed to explain the source of approximately $18,000 in cash at a time when he had been out of (legitimate) work for approximately two years."

We see no clear error in the district court's finding. That is, the court's conversion of the cash into the equivalent amount of meth was not "[im]plausible in light of the record as a whole." *Koss*, 812 F.3d at 466 (citation omitted). Although the record reflects that cocaine and marijuana were also seized from Lucio's residence, Lucio was undisputedly a meth dealer. Even assuming he dealt other drugs, nothing suggests he sold enough to amass over $18,000. More to the point, as discussed, the record plausibly supports the inference that Lucio regularly dealt in kilogram quantities of meth—quantities easily sufficient to account for the amount of cash seized. Considering the record as a whole, the district court did not clearly err in

concluding it was more likely than not that these undisputed drug proceeds came from meth sales. *See United States v. Johnston*, 127 F.3d 380, 403 (5th Cir. 1997) (upholding conversion of $90,000 into equivalent quantity of cocaine, despite the fact that defendants also trafficked marijuana, because there was no evidence of correspondingly large sales of marijuana and "considerable evidence" of sales of large amounts of cocaine).

## IV

The district court did not clearly err in calculating the drug quantity attributable to Lucio. We therefore AFFIRM Lucio's sentence.