# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2022

Lyle W. Cayce
Clerk

No. 21-50091

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ZAIRA VALENZUELA LUJAN,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:20-CR-167-2

Before DAVIS, WILLETT, and OLDHAM, *Circuit Judges*.
W. EUGENE DAVIS, *Circuit Judge*:

Defendant-appellant Zaira Valenzuela Lujan pleaded guilty to one count of conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine. During the investigation into Lujan and her boyfriend, Orlando Alvarado, police seized, among other things, $10,694. At sentencing, the district court converted the cash into a quantity of methamphetamine as part of its calculation of Lujan's advisory sentencing range under the United States Sentencing Guidelines.

No. 21-50091

Lujan argues that the district court erred by using the "wholesale" rate rather than the "retail" rate when it performed the cash-to-drug conversion. We hold that the district court erred in its drug quantity attribution because it implausibly found that Lujan would have used the entirety of the $10,694 to purchase more methamphetamine. Accordingly, we VACATE Lujan's sentence and REMAND for the district court to reconsider the amount of methamphetamine attributable to Lujan.

## I.

In June 2020, investigators with the Ector County Sheriff's Office began an investigation after receiving information that Orlando Alvarado was distributing large quantities of methamphetamine in the area around Midland-Odessa, Texas. Between June 29 and July 7, 2020, the investigators conducted three controlled buys with Alvarado, during which a confidential informant purchased 5.035, 5.494, and 12.076 grams of methamphetamine.

On July 8, 2020 officers performed a traffic stop of Alvarado's vehicle which was also occupied by his girlfriend, Lujan. Pursuant to Alvarado's consent, the agents searched the vehicle and discovered 28.505 grams of methamphetamine in Alvarado's glasses case, a glass pipe, and a firearm. The officers also discovered a gun, a glass pipe, a digital scale, plastic baggies, 1 gram of methamphetamine, and 0.4 grams of marijuana in Lujan's purse. Police arrested Alvarado following the traffic stop, but they released Lujan.

The next day, police executed a search warrant on Alvarado and Lujan's hotel room. They seized another firearm, 109.7 grams of methamphetamine, 24.137 grams of heroin, 22 grams of marijuana, and $10,694 in U.S. currency.

Police continued their investigation and, about a month later, conducted a spot-check on Lujan's residence regarding the sale and distribution of methamphetamine. They observed Lujan and several other

individuals arrive in a Ford F-150. The group entered the residence, and then Lujan exited and reentered the F-150. After Lujan drove several blocks in the dark without headlights, the police stopped Lujan. She consented to a search of her vehicle, and officers discovered 28.51 grams of methamphetamine and eight ecstasy pills. Lujan denied that the methamphetamine belonged to her, but admitted that she had sold approximately three ounces of methamphetamine since Alvarado's arrest.

The Government charged Lujan with one count of conspiracy to distribute and to possess with the intent to distribute 50 grams or more of methamphetamine. Lujan pleaded guilty to the offense without a plea agreement.

According to the Presentence Investigation Report ("PSR"), Lujan was accountable for 1.85 kilograms of methamphetamine. That amount consisted of three components: (1) 167.715 grams, the total quantity of methamphetamine seized from Alvarado and Lujan, (2) the three ounces Lujan admitted to selling after Alvarado's arrest, and (3) 1,600 grams based on a cash-to-drug conversion of the $10,694 seized from the couple's hotel room. For the third quantity, the district court relied on the information in the PSR that, according to the case agent, "$10,694 can purchase 1,600 grams of actual methamphetamine." Based on the drug quantity attribution, the PSR calculated Lujan's advisory range under the Sentencing Guidelines as between 168 and 210 months of imprisonment.

Lujan objected to the PSR's cash-to-drug conversion on several grounds, including that the PSR inappropriately used the "wholesale" price of methamphetamine, rather than "the going price of methamphetamine . . . to an average user," i.e., the "retail" price. She argued that, according to figures from the Addiction Center and the U.S. Justice Department, methamphetamine costs between $20 and $105.49 per gram. Using these

No. 21-50091

figures, Lujan asserted that she should be held accountable for between 353.135 grams and 786.465 grams of methamphetamine. Lujan argued that, if the district court applied the low-end of those figures, her advisory guideline range would be between 108-135 months imprisonment.

The district court overruled the objections at sentencing and adopted the PSR in its entirety, including the complete 1.85-kilogram drug quantity attribution. The court sentenced Lujan to 168 months of imprisonment, to be followed by a five-year term of supervised release.  Lujan timely appealed.

## II.

### A.

When a defendant is convicted of a drug offense, his or her base offense level under the Sentencing Guidelines depends in part on the quantity and type of drugs involved in the offense.[1] At sentencing, the Government must prove the drug quantity attributable to a defendant by a preponderance of the evidence.[2]

A district court is not limited to considering the drugs seized during an investigation. Indeed, the commentary to § 2D1.1 of the Sentencing Guidelines provides, if the "amount seized does not reflect the scale of the offense, the court *shall* approximate the quantity of the controlled substance."[3] To reach this estimate, "the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and

---

[1] *See United States v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009); U.S. Sent'g Guidelines Manual § 2D1.1(a)(5), (c) (U.S. Sent'g Comm'n 2021) [hereinafter U.S.S.G.].

[2] *United States v. Turner*, 319 F.3d 716, 723 (5th Cir. 2003).

[3] U.S.S.G. § 2D1.1 cmt. n.5 (emphasis added).

No. 21-50091

the size or capability of any laboratory involved."[4] This Court, along with many of our sister circuits, have recognized that a district court may rely on cash-to-drug conversions when making guideline calculations.[5]

To perform a cash-to-drug conversion, the district court must first determine that an amount of cash is attributable to drug dealing.[6] Next, the court must determine an appropriate conversion ratio, i.e., the price per unit of drugs.[7] The court then divides the amount of cash (the numerator) by the conversion ratio (the denominator), resulting in a drug quantity attributable to the defendant.[8]

The district court's drug quantity calculation is a factual determination reviewed for clear error.[9] A factual determination is not clearly erroneous if it is plausible in light of the record as a whole.[10]

**B.**

---

[4] *Id.*

[5] *See United States v. Johnston*, 127 F.3d 380, 403 (5th Cir. 1997); *United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008); *United States v. Keszthelyi*, 308 F.3d 557, 576–78 (6th Cir. 2002); *United States v. Otis*, 127 F.3d 829, 836 (9th Cir. 1997) (per curiam); *United States v. Tokars*, 95 F.3d 1520, 1542 (11th Cir. 1996); *United States v. Ferguson*, 35 F.3d 327, 333 (7th Cir. 1994); *United States v. Rios*, 22 F.3d 1024, 1026–27 (10th Cir. 1994); *United States v. Watts*, 950 F.2d 508, 514 (8th Cir. 1991); *United States v. Hicks*, 948 F.2d 877, 881–82 (4th Cir. 1991); *United States v. Gerante*, 891 F.2d 364, 368–70 (1st Cir. 1989).

[6] *See United States v. Perez*, 785 F. App'x 207, 209 (5th Cir. 2019); *United States v. Jackson*, 990 F.2d 251, 254 (6th Cir. 1993) (citing *Watts*, 950 F.2d at 514). Although *Perez* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

[7] *See Perez*, 785 F. App'x at 209; *Jackson*, 990 F.2d at 254.

[8] *See Perez*, 785 F. App'x at 209; *Jackson*, 990 F.2d at 254.

[9] *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005)

[10] *Id.*

No. 21-50091

Lujan argues that, in estimating the quantity of methamphetamine attributable to her, the district court erred by using the "wholesale" price (the price she could have obtained when *purchasing* methamphetamine) rather than the "retail" price (the price she could have obtained when *selling* methamphetamine). The Government concedes that the district court applied the "wholesale" price. However, in the Government's view, the district court inferred that the $10,694 was money that Lujan and Alvarado would use to resupply their drug "stash." Thus, the Government contends that the district court appropriately used the "wholesale" price to estimate the amount of drugs they could buy with the cash in their hotel room.

When converting cash to drug quantities, courts generally estimate the quantity of drugs a defendant *sold*. In most cases circuit courts that have addressed cash-to-drug conversions have taken this approach..[11] Under this approach, the numerator is the cash proceeds from drug sales, and the denominator is the price the defendant generally obtains when he or she sells drugs.[12] Whether a court considers the "wholesale" or "retail" price of a drug as the denominator depends on the quantity the defendant ordinarily deals in.[13]

---

[11] *See United States v. Lucio*, 985 F.3d 482, 488 (5th Cir. 2021); *Johnston*, 127 F.3d at 403; *Jones*, 531 F.3d at 176; *Kesztheyli*, 308 F.3d at 576–78; *Otis*, 127 F.3d at 836; *Tokars*, 95 F.3d at 1542; *Ferguson*, 35 F.3d at 332–34; *Rios*, 22 F.3d at 1028; *Jackson*, 990 F.2d at 253; *Watts*, 950 F.2d at 511-12, 514–15;; *Gerante*, 891 F.2d at 369. *But see Hicks*, 948 F.2d at 880–81 & n.1 (applying the wholesale price when defendant admitted to police that seized cash would be used to purchase cocaine).

[12] *See, e.g.*, *Lucio*, 985 F.3d at 484 (converting $18,368 seized using the defendant's "stated price of $6,500").

[13] *Compare id.* at 484, 488 (affirming the conversion of $18,368 into 2.3 kilograms of methamphetamine based on a $6,500 per kilogram conversion ratio, which was the defendant's stated price, and noting that "the record plausibly supports the inference that [the defendant] regularly dealt in kilogram quantities of meth"), *and Johnston*, 127 F.3d at 386, 403 (noting that an undercover agent attempted to buy several kilograms of cocaine

No. 21-50091

Even though Lujan's PSR indicates that the $10,694 is "believed to be from the *sales* of methamphetamine," the district court took a different approach. Specifically, by applying the "wholesale" price of methamphetamine, rather than the "retail" price, the district court treated the $10,694 as money that Lujan and Alvarado intended to use for future drug *purchases*. In other words, the district court assumed that Lujan and Alvarado would have used all of their illicit profits, $10,694, to purchase more methamphetamine.

That assumption is purely speculative here, and we conclude that it is implausible on the facts presented to the district court.[14] Outside of their illegal drug enterprise, neither Alvarado nor Lujan were employed or had any other source of income. It is inescapable that some of the proceeds of their drug business must have been devoted to living expenses such as housing,

---

from one of the conspirators, applying an $18,000-per-kilogram price for cocaine, and noting that "there is considerable evidence of cocaine shipments equaling or exceeding five kilograms"), *with Jones*, 531 F.3d at 177 ("Because the confidential informant had twice purchased 3.5 grams of crack cocaine for $120, the district court reasonably found that [the defendant] would have been able to sell crack for approximately $34 per gram . . . ."), *and Jackson*, 990 F.3d at 254 (noting that there was some evidence that the defendants charged "$25 per 'rock'" of cocaine).

[14] The Government argues that the district court was entitled to make this finding based on the PSR, and that Lujan failed to submit rebuttal evidence to show that the cash would have gone to other uses. This argument lacks merit because it is the Government's burden, in the first instance, to prove the total drug quantity attributable to Lujan. *See Turner*, 319 F.3d at 723. The only evidentiary basis to attribute 1,600 grams to Lujan based on the $10,694 seized is the statement in the PSR that "$10,694 can purchase 1,600 grams of actual methamphetamine." Without evidence showing that Lujan and Alvarado *would* purchase 1,600 grams of methamphetamine, this is the sort of "[b]ald conclusionary statement[]" that lacks a "patina of reliability" despite its inclusion in the PSR. *United States v. Barfield*, 941 F.3d 757, 762 (5th Cir. 2019) (quoting *United States v. Elwood*, 999 F.2d 814, 817–18 (5th Cir. 1993)).

No. 21-50091

food, and medical needs.[15] There is nothing in the PSR, or elsewhere in the record, that would enable the district court to determine which portion of the $10,694 would go to repurchase drugs, and which portion would go to other costs, including living expenses.[16] Thus, we conclude that the district court erred by treating the entire amount of the seized cash as money that Lujan and Alvarado would have used to purchase more methamphetamine.

In sum, the district court erred when it implausibly found that Lujan and Alvarado would have used the entire amount of the $10,694 seized to purchase more methamphetamine. The error was not harmless because it resulted in an incorrect guideline calculation, and because the Government does not even attempt to carry its "heavy burden" of showing that the district court would have imposed the same sentence notwithstanding the error.[17] Accordingly, we VACATE Lujan's sentence and REMAND for the district court to reconsider the amount of methamphetamine attributable to Lujan.

---

[15] The PSR notes that Lujan suffers from high blood pressure, is prescribed medication, and has medical debt of $766.

[16] *Cf. Perez*, 785 F. App'x at 208–09. In *Perez*, we rejected the defendant's argument that the district court incorrectly considered "the entire amount of cash found on [the defendant], even legitimate cash, into drugs." *Id.* at 208. We held that the record plausibly supported the conclusion that the cash was proceeds of drug sales because the defendant had no legitimate source of income. *Id.* at 209. While that reasoning holds true when a court tries to determine if cash is "proceeds" from drug sales, it fails when a court instead asks whether the cash is intended for future purchases.

[17] *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012) (citing *Gall v. United States*, 552 U.S. 36, 51 (2007); *United States v. Ibarra-Luna*, 628 F.3d 712, 714, 717–18 (5th Cir. 2010)).