# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 6, 2021

Lyle W. Cayce
Clerk

No. 19-50830

United States of America,

*Plaintiff—Appellee*,

*versus*

Michael Herman; Cynthia Herman,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CR-301

Before Dennis, Higginson, and Willett, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Appellants Michael and Cynthia Herman owned and operated three restaurants in Texas. In early 2013, the Internal Revenue Service initiated an undercover operation to determine whether the Hermans' business tax returns understated gross receipts and whether the Hermans claimed personal expenses as business expenses on those returns. Following a four-day trial, a jury convicted the Hermans on one count of conspiracy to defraud the United States. The jury also convicted Michael of five counts and Cynthia of two counts of willfully filing false tax returns. The Hermans timely appealed.

No. 19-50830

On appeal, the Hermans argue that the district court erred when it excluded defense exhibits, excluded the Hermans' expert witness's testimony, and limited the Hermans' cross-examination of two Government witnesses. In addition, they argue that the district court's cumulative errors deprived them of a fair trial. Separately, Cynthia also argues that Count One of the indictment was legally insufficient. For the reasons articulated below, we AFFIRM.

I.

Michael and Cynthia Herman, husband and wife, owned and operated three restaurants in Bastrop County, Texas: Cindy's Gone Hog Wild, Cindy's Downtown, and Hassler Brothers Steakhouse. Michael is a retired medic from the Houston Fire Department with an M.B.A. in marketing, and Cynthia is a former secretary with a high school degree. Both worked in and actively managed the restaurants.

A. IRS Investigation

The Internal Revenue Service ("IRS") has a program called the Business Opportunity Project, which is designed to identify businesses that underreport income. Through this program, the IRS initiated an undercover investigation of the Hermans in early 2013. The IRS investigated the Hermans because they had listed one of their restaurants, Cindy's Gone Hog Wild, for sale at an asking price that appeared high compared to its reported gross receipts. IRS Special Agent Daniel Vela assumed the identity of "Daniel Ramirez" and posed as an interested buyer. Over the course of the investigation, Agent Vela had three in-person meetings with the Hermans on May 9, 2013; May 30, 2013; and August 8, 2013. He also had phone conversations and exchanged text messages with Michael. Agent Vela was "wired" for all the meetings and phone conversations, and he recorded 10 hours and 14 minutes of video and audio clips.

During the undercover investigation, Michael and Cynthia made various statements to Agent Vela that suggested they did not include all the cash receipts generated by their restaurants on their financial reports and tax returns.  For example, Michael told Agent Vela: "Because, you know, the cash, that's something that . . . you can deal with and, and never has to make it to the bank."  The Hermans also suggested they used business funds to pay for their personal expenses.  For example, Michael told Agent Vela: "[T]he IRS is not going to allow us to run this business the way we were running it. Paying our house, paying our utility, paying our car notes, paying everything without us showing we were making something."

The Hermans' account of their interactions with Agent Vela as "Daniel Ramirez" is that he was a "sleazy buyer" who "repeatedly" asked about "unreported cash."  They argue that any inculpatory statements they made were because they were trying to respond favorably to an interested buyer and sell their restaurant.  The Hermans point to various exculpatory statements they also made to Agent Vela, including: "what you do with [the cash flow] is your business," and "we've put every dime in the bank to make sure our business stays solid and solvent."

After the undercover operation, the IRS executed search warrants on the Hermans' home and three restaurants.  IRS Special Agent Daniel Fannin became the lead agent coordinating the investigation.  He concluded that the Hermans had not deposited all cash into their bank accounts and had paid personal expenses with business funds.

B. Procedural History

In 2017, a grand jury indicted Michael and Cynthia with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (Count One) and separate counts of willfully filing materially false tax returns in violation of 26 U.S.C. § 7206(1) (Counts Two through Seven).  Counts Two

No. 19-50830

through Four pertained to personal tax returns and charged both Michael and Cynthia; Counts Five through Seven pertained to corporate tax returns and charged only Michael because only he signed those returns.

In 2019, Michael and Cynthia proceeded to trial, at which neither testified. After a four-day trial, the jury convicted both defendants on the conspiracy count (Count One), convicted Michael on five false return counts (Counts Two, Three, and Five through Seven), and convicted Cynthia on two false return counts (Counts Two and Three). Both Hermans were acquitted on one false return count for their 2012 personal tax returns (Count Four).

The district court sentenced Michael to 21 months' imprisonment followed by three years of supervised release. The district court sentenced Cynthia to five years' probation. Both were ordered to pay $157,719 in restitution to the IRS.

## II.

The Hermans first argue that the district court erred when it excluded (1) certain audio recording excerpts of their conversations with IRS Agent Vela and (2) a transcript of the recorded conversations redacted to show only Agent Vela's questions.[1]

---

[1] We reject the Government's contention that the Hermans waived their challenge to some of the excluded recordings. A litigant waives an issue if she or he "fails to adequately brief it." *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001). The Hermans specifically identify the excluded exhibits, provide record citations and arguments as to why they were erroneously excluded, and cite legal authority to support their arguments. *See* FED. R. APP. P. 28(a)(8)(A).

No. 19-50830

## A. Defense Exhibits

Before trial, the Government provided the Hermans with 16 audio clips it intended to play at trial totaling about 25 minutes of recorded conversations between the Hermans and Agent Vela (Government Exhibits 57A through 57P). In response, the Hermans provided the Government with 18 supplemental audio clips totaling an additional 43 minutes of conversation pulled from the same set of recordings (Defense Exhibits 32A through 32O).[2]

In urging the district court to admit their 18 supplemental audio clips, the Hermans relied on Federal Rule of Evidence 106. Premised on fairness, Rule 106 allows a party to introduce the remainder of a written or recorded statement when its adversary has selectively introduced another portion of that writing or recorded statement in a way that creates a misleading impression. *See* FED. R. EVID. 106. The Hermans asserted that their proffered clips provided necessary context for the jury, arguing that the Government had cherry-picked recordings of their incriminating statements but left out clips in which they made contradictory statements or clips in which Agent Vela prompted them to make the incriminating statements. The Government objected to the supplemental recordings as inadmissible hearsay, arguing that the Hermans were attempting to use their own out-of-court statements to establish certain facts and mitigate other damaging admissions without testifying at trial. In addition, the Government argued that Rule 106 was inapplicable because many of the clips the Hermans had moved to introduce were not made during the same conversation—or even the same day—as the inculpating statements they sought to mitigate.

---

[2] Defense Exhibits 31A through 31R (audio recordings) correspond with Defense Exhibits 32A through 32O (transcripts). This opinion will refer to the transcripts in the 32 series.

No. 19-50830

The district court ruled that the Hermans could present supplemental audio recording clips on cross-examination as long as they were recorded on the same date and were about the same subject matter as the Government's audio recordings. At trial, during the cross-examination of Agent Vela, the Hermans moved to admit 15 supplemental audio recordings into evidence. The district court denied their motion.[3]

On appeal, Michael argues that the district court erred by excluding 13 of the audio recordings, while Cynthia argues error for only ten of the excluded recordings. Cynthia also asserts that the district court erroneously excluded a 35-page redacted transcript of recorded conversations that contained only the undercover agent's questions to the Hermans. This redacted transcript contains Agent Vela's questions from all his meetings and phone calls with the Hermans. Cynthia explains that the redacted transcript addressed the Government's hearsay objections by removing the Hermans' statements and leaving only Agent Vela's questions and showed Agent Vela repeatedly asked questions about unreported cash in order to inculpate the Hermans.

## B.  Standard of Review

We review the district court's exclusion of the Hermans' exhibits as an evidentiary ruling for abuse of discretion, *United States v. Branch*, 91 F.3d 699, 727 (5th Cir. 1996), subject to harmless error review, *United States v. Portillo*, 969 F.3d 144, 177 (5th Cir. 2020). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *Portillo*, 969 F.3d at 168 (quoting *United States v. Insaulgarat*, 378 F.3d 456, 464 (5th Cir. 2004)). For an evidentiary ruling

---

[3] Nevertheless, it is notable that on recross-examination of Agent Vela, the district court allowed the defense to use two of their proffered audio clips.

6

to constitute reversible error, it must have affected the defendant's "substantial right." FED. R. EVID. 103(a); *see United States v. Sanders*, 343 F.3d 511, 519 (5th Cir. 2003). "Error is harmless if, in light of the whole record, the contested evidence did not contribute to the verdict." *United States v. Dixon*, 185 F.3d 393, 398 (5th Cir. 1999).

The Hermans dispute the applicable standard of review. They argue that that the district court's exclusion of their exhibits violated their Sixth Amendment rights to confront witnesses and present a complete defense, and they urge us to review the district court's ruling de novo, subject to harmless error review. *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008). We reject this argument for two reasons.

First, our court has held that "[n]either the Constitution nor Rule 106 . . . requires the admission of the entire statement once any portion is admitted in a criminal prosecution." *Branch*, 91 F.3d at 729 (citations omitted). Nor does applying Rule 106 to "require[] that a defendant demonstrate with particularity the unfairness in the selective admission of his . . . statement[s]" violate a defendant's constitutional rights. *Id.*

In addition, before the district court, the Hermans repeatedly relied on Rule 106, not the Sixth Amendment or any non-hearsay admissibility argument,[4] to argue that the audio recordings should be admitted into evidence. While Michael's counsel did suggest, pretrial, that exclusion of the recordings would violate the Hermans' "constitutional rights," he never particularized this concern and, specifically, he did not invoke the Sixth Amendment. Given the Hermans' prior reliance on the evidentiary rules and

---

[4] *Cf.* Daniel J. Capra & Liesa L. Richter, *Evidentiary Irony and the Incomplete Rule of Completeness: A Proposal to Amend Federal Rule of Evidence 106*, 105 MINN. L. REV. 901 (2020) (giving an overview of federal court application of Rule 106 and the possibility of future revision to encompass the full breadth of the common law rule of completeness).

No. 19-50830

their failure to make contemporaneous objections based on the Constitution, their attempts to recast their argument as a constitutional violation on appeal appear to be a post hoc recharacterization to obtain a more favorable standard of review, which we reject. *Cf. Hadwani v. Gonzales*, 445 F.3d 798, 801 (5th Cir. 2006) (per curiam) (rejecting a petitioner's "constitutional claim" because it was "an abuse of discretion argument [cloaked] in constitutional garb" in an immigration law context (alteration in original) (quoting *Torres-Aguilar v. INS*, 246 F.3d 1267, 1271 (9th Cir. 2001))).

## C. Discussion

Federal Rule of Evidence 106, which "partially codifies" the common law rule of completeness,[5] "guards against admission into evidence of truncated statements likely to present an out-of-context picture to the jury." *United States v. Jones*, 663 F.2d 567, 571 (5th Cir. 1981). Rule 106 provides:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

---

[5] The "rule of completeness" is a common law principle of evidence that was designed to address two concerns. First, the rule addresses the "concern that the court not be misled because portions of a statement are taken out of context." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 n.14 (1988). Second, "the rule has also addressed the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material." *Id.* (emphasis omitted). The rule alleviates this concern by allowing the additional material to be "considered contemporaneously" with the out-of-context statement. *Id.* at 172 (quoting FED. R. EVID. 106). "Federal Rule 106 formally codifies the completeness doctrine only as to 'writings or recorded statement[s],'" not as to conversations or other oral statements. DAVID P. LEONARD & RICHARD D. FRIEDMAN, THE NEW WIGMORE: SELECTED RULES OF LIMITED ADMISSIBILITY, § 5.7.3 n.40 (3d ed. 2020).

Fed. R. Evid. 106. Rule 106 requires the introduction of a writing or recorded statement only when the omitted portion is "necessary to qualify, explain, or place into context the portion already introduced," and we analyze each of the excluded defense exhibits under this standard. *Branch*, 91 F.3d at 728 (quoting *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988)). While Rule 106 "encourages completeness in writings or recordings, it restricts a requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted." *United States v. Crosby*, 713 F.2d 1066, 1074 (5th Cir. 1983). Rule 106 permits a party to correct an incomplete and misleading impression created by the introduction of part of a writing or recorded statement; it does not permit a party to introduce writings or recorded statements to affirmatively advance their own, alternative theory of the case. *Branch*, 91 F.3d at 731; *see also* Capra & Richter, *supra* note 4, at 913–14.

### 1. *Defense Exhibit 32A*

In Defense Exhibit 32A, the Hermans describe the origin of the name of one of their restaurants, Cindy's Gone Hog Wild, and explain that the restaurant is famous "around the world." Michael does not identify a misleading impression created by Government evidence or a corresponding Government Exhibit that 32A is "necessary to qualify, explain, or place into context." The information contained in 32A has not been shown to be related to the Government's allegations against the Hermans or its theory of the case. Thus, the district court did not err in excluding this exhibit.

### 2. *Defense Exhibit 32B*

In Defense Exhibit 32B, the Hermans tell Agent Vela that they started using a payroll service because they tried and failed to do payroll on their own.

The Hermans argue that 32B is necessary context for Government Exhibit 57B, in which they tell Agent Vela how Pacesetter, their payroll service, works.[6] The Government alleged that there were people on the Hermans' payroll who did not belong on the payroll. At most, 32B shows that the Hermans decided to outsource their business's payroll function when they were unable to perform it themselves. But 32B does not show that the Hermans had no involvement in payroll after it was outsourced. The district court did not abuse its discretion in deeming 32B not to be "necessary to qualify, explain, or place [57B] into context."

### 3. *Defense Exhibit 32C*

In Defense Exhibit 32C, Michael tells Agent Vela that he and Cynthia each take a "small salary" and "anything left at the end of the year." The Hermans argue that 32C is necessary context for Government Exhibit 57C, in which Michael tells Agent Vela that the Hermans' business creates hundreds of thousands of dollars in "cash flow" and that "in 2008" the business was "paying for everything," including the Hermans' "cars" and "house." The conversation in 32C is not about 2008; rather it is about the present time when the conversation was taking place: 2013. The district court did not abuse its discretion in deeming 32C not to be "necessary to qualify, explain, or place [57C] into context."

### 4. *Defense Exhibit 32D*

In Defense Exhibit 32D, Agent Vela asks about getting more money out of the business, and Michael responds by discussing profit margins and investing more in marketing. The Hermans argue that 32D is necessary

---

[6] In their briefing, the Hermans identify a corresponding government exhibit for most of the proffered defense exhibits. We conduct our Rule 106 analysis based on these pairs of documents identified by the parties.

context for Government Exhibit 57A, in which Michael states that the Hermans receive "$800 a month cash [from gaming machines] that's just . . . it's whatever you're going to do with that." Michael's discussion of margins and marketing with Agent Vela does not "qualify, explain, or place into context" the fact that the Hermans made $800 per month in cash from the gaming machines in their restaurant.

### 5. *Defense Exhibit 32E*

In Defense Exhibit 32E, Cynthia and Michael invite Agent Vela to attend "Bike Night" at Cindy's Gone Hog Wild, an event for which the Hermans "partner[]" with the Cowboy Harley-Davidson motorcycle club. The Hermans explain that the bikers "love[]" the restaurant and the place will be "frickin' packed." Michael does not identify a corresponding Government Exhibit. 32E shows that the Hermans considered themselves to have a thriving business based on local motorcycle club members' patronage. This is not related to the Government's allegations against the Hermans and thus has not been shown to be "necessary to qualify, explain, or place [a Government exhibit] into context."

### 6. *Defense Exhibit 32F*

In Defense Exhibit 32F, Michael states: "All our cash deposits go through that bank." The Hermans argue that 32F is necessary context for Government Exhibit 57A, in which Michael states that the Hermans receive "$800 a month cash [from gaming machines] that's just . . . it's whatever you're going to do with that." The Government's exhibit implies that the Hermans did not deposit all of their cash into a bank. The Hermans' exhibit suggests that they did. The Hermans' exhibit, therefore, corrects the misimpression the Government's exhibit alone creates, and the district court erred in excluding Defense Exhibit 32F.

"[I]n light of the whole record," however, this error was harmless. *Dixon*, 185 F.3d at 398.  At trial, the Government established that, during the five-year period at issue, the total cash sales reflected in the Hermans' point-of-sale system, in addition to the cash generated from gaming machines, exceeded the amount of cash the Hermans deposited into their business bank accounts by at least $570,000.  Even without Michael's statement about "$800 a month cash" from gaming machines, the jury had ample "basis to convict the defendants" based on the unreported cash sales reflected in the point-of-sale system alone.  *Portillo*, 969 F.3d at 177.

### 7. *Defense Exhibit 32G*

In Defense Exhibit 32G, Michael tells Agent Vela that if Agent Vela "need[s]" "[a]nything else" he can "put a release together" and "forward it on to [the Hermans'] CPA."  The Hermans argue that 32G is necessary context for Government Exhibit 57C, in which Michael tells Agent Vela that the Hermans' business creates hundreds of thousands of dollars in "cash flow" and  that "in 2008" the business was "paying for everything," including the Hermans' "cars" and "house."  Cynthia characterizes 32G as Michael "telling Agent Vela to contact [the Hermans'] CPA."  But we read 32G as an offer that Agent Vela can talk to the Hermans' CPA through the Hermans and after Agent Vela signs a release.  Regardless, the Hermans have not shown how Michael's statement that "in 2008" the business "was paying for . . . everything" creates a misleading impression and therefore have not shown 32G to be "necessary to qualify, explain, or place [57C] into context."

### 8. *Defense Exhibit 32H*

In Defense Exhibit 32H, Michael explains he is setting up a portable point-of-sale system for beer sales made at "beer troughs," ice buckets set up away from the main bar where customers could order beer and food.  The

Hermans argue that 32H is necessary context for Government Exhibit 52G, in which Cynthia states "there's not going to be a paper trail" of cash sales and Michael also later states, "And if you're looking for trail of cash, uh, that's not going to exist."

While the Government's exhibit may create the general impression that the Hermans did not keep any record of cash sales, the Hermans' exhibit does not alter that impression. 32H shows only that the Hermans were setting up a portable point-of-sale system at a beer trough on the day the conversation was recorded—a single transactional point that does not "qualify, explain, or place into context" the Hermans' broader accounting practices discussed in the Government's exhibit.

### 9. *Defense Exhibit 32I*

In Defense Exhibit 32I, when discussing the point-of-sales system, Agent Vela asks, "How can you like, um, manipulate the sales a little bit, you know, so you have the right inventory and your numbers don't get all screwed up?" to which Michael responds, "What do you mean? I don't follow what you're saying." The Hermans argue that 32I is necessary context for Government Exhibit 57I, in which Agent Vela asks whether cash "gets rung up in the point of sales system," and Michael answers, "There's ways to manipulate that and to where it just doesn't even . . . doesn't happen."

The Hermans argue that Agent Vela's question in 32I introduces the concept of "manipulat[ing]" the point-of-sale system into their conversation. We agree. Agent Vela's question prompted Michael, shortly thereafter, to characterize the point-of-sale system to appeal to a prospective buyer, including using the exact phrasing that Agent Vela had used earlier. Thus it does "qualify, explain, or place into context" Michael's later statement for the jury. Consequently, the district court erred in excluding Defense Exhibit 32I.

13

But this error was harmless. Our review of the record does not show that Michael's statement "permeate[d] the record" or was even "a crucial part of the government's case." *Portillo*, 969 F.3d at 177 (alteration in original) (quoting *United States v. Westmoreland*, 841 F.2d 572, 579 (5th Cir. 1988)). The Government did not rely on Michael's statement about "manipulat[ing]" the point-of-sale system in its opening, closing, or rebuttal arguments at trial. Further, given the powerful other evidence the Government introduced at trial—including evidence of $94,000 of personal expenses paid with business funds and evidence that the Hermans did not tell their accountant about $570,000 made from sales in cash—the jury had ample other "bas[e]s to convict the defendants." *Id.*

### 10. *Defense Exhibit 32J*

In Defense Exhibit 32J, Michael tells Agent Vela that "what you do with [the cash flow] is your business" but that he and Cynthia "put every dime in the bank to make sure [their] business stays solid and solvent." Michael also states, "The cash flow's there. . . . [T]he reason why I don't pull, you know, the cash out of it is because I got behind the eight ball." The Hermans argue that 32J is necessary context for Government Exhibit 57K, in which Agent Vela asks whether he can assume that he can "add in another seventy-five hundred dollars a . . . month that, you know, doesn't get rung up and I can add it to my calculations" to which Michael answers, "Yes . . . . Seventy-five hundred and ten thousand dollars."

Michael's statement to Agent Vela that "what you do with [the cash flow] is your business" is one of his opening, unprompted remarks in their phone call. The conversation progresses over multiple topics, and it pivots when Agent Vela asks if "the gross receipts . . . are really better than what they are on paper," which Vela says would "change[] everything." Vela then asks Michael what the "true sales or gross receipts" of the business are, and

twice asks what sales aren't "rung up" in calculating the restaurant's gross receipts, before asking the question about seventy-five hundred dollars. Michael's statement in 32J is not a response to and would not contextualize the portion of their conversation in 57K about "ringing up" cash sales.

32J also includes Michael's statements that he is "not into" "fraud" and "deception," and that he and Cynthia operated their business with "character and integrity." Michael argues that these statements show he was running an honest business, and that his statements that he and Cynthia "put every dime in the bank to make sure [their] business stays solid and solvent," and "the reason I don't pull cash out of the business is because I got behind the eight ball," were necessary to provide context for his later statement that Agent Vela could "add in another seventy-five hundred dollars a . . . month [in cash] that . . . doesn't get rung up." These statements, however, do not place the admitted portion of 57K into context to correct a distorted and misleading impression so much as they seek to separately provide an alternate narrative, which is not within the current restrictive scope and purpose of Rule 106. *Branch*, 91 F.3d at 731; *see also* Capra & Richter, *supra* note 4, at 913–14.

### 11. *Defense Exhibit 32K*

In Defense Exhibit 32K, Michael explains to Agent Vela that the Hermans are in debt because of a fire at the restaurant that "knocked [him] in the dirt" and made him "g[e]t behind the eight ball."[7] Michael does not

---

[7] In December 2010, Cindy's Gone Hog Wild was destroyed in a fire. In their conversations with Agent Vela, the Hermans shared that they were "in the middle of litigation" with their insurance company but had taken out high-interest loans to keep the business afloat until the insurance company paid out their claims. Michael explained to Agent Vela that he was "behind the eight ball" (*i.e.*, in debt) from the fire, which is why he was interested in selling the restaurant.

identify a corresponding Government Exhibit. 32K provides a rationale as to why the Hermans would have deposited all their cash into the bank: they were in debt from a recent fire at their restaurant and were trying to keep their business solvent. This provides broad context for their case, but Michael has not shown that it "qualif[ies], explain[s], or place[s] into context" any specific Government allegation.

### 12. *Defense Exhibit 32L*

In Defense Exhibit 32L, Michael offers to show Agent Vela his tax returns. The Hermans argue that 32L is necessary context for Government Exhibit 57M, in which Michael shows Agent Vela "20 grand" in cash "from this past week," stating "I just haven't been to the bank." The Hermans have not shown how Michael's offer to show Agent Vela tax returns (reflecting previous years' financials) "qualif[ies], explain[s], or place[s] into context" having tens of thousands of dollars of cash in his office.

### 13. *Defense Exhibit 32O*

In Defense Exhibit 32O, Michael tells Agent Vela that he and Cynthia draw a small salary ("almost 800 bucks a month between both of us") once a month. The Hermans argue that 32O is necessary context for Government Exhibit 57P, in which Michael explains that beer sales result in large volumes of cash. The Hermans have not shown how the fact that they draw only a small salary for themselves "qualif[ies], explain[s], or place[s] into context" the fact that beer sales in their restaurants generate large volumes of cash.

### 14. *Defense Exhibit 139*

Cynthia alleges that the district court erred in excluding Defense Exhibit 139, a 35-page redacted transcript of recorded conversations that contained only Agent Vela's questions to the Hermans. Cynthia argues that the redacted transcript showed the probing nature of Agent Vela's questions.

No. 19-50830

This high-level argument does not meet *Branch*'s standard that Defense Exhibit 139 is "necessary to qualify, explain, or place into context" another portion of the recorded conversation that is "already introduced." *Branch*, 91 F.3d at 728.

In sum, we find no reversible error in the district court's exclusion of the proffered defense exhibits.

### III.

The Hermans next argue that the district court erred when it barred expert testimony from William Brown, a forensic accountant.

### A.  Defense Expert Testimony

The Hermans sought to call William Brown, CPA and forensic accountant, as an expert witness at trial.  Brown intended to testify about two topics: revenue and expenses.  As to revenue, Brown would testify that the Government had overstated actual gross receipts of both Cindy's Gone Hog Wild and Cindy's Downtown by $409,000 because it had failed to deduct non-income items like loans and bank transfers.  As to expenses, Brown would testify that he had identified about 400 transactions totaling $94,000 that could constitute business expenses paid from personal accounts, which he opined "should be considered as well as some sort of mitigating factor." Brown did not intend to testify as to the Government's main allegations against the Hermans: whether they had $570,000 worth of undeposited cash receipts or whether the personal expenses they paid through their business were, in fact, not personal expenses.  Over the Hermans' objections, ultimately, the district court excluded Brown's testimony in its entirety as both irrelevant and confusing to the jury.  Importantly, however, the district court deferred this assessment until trial, after the Government's evidence was complete and the defense was able to proffer Brown directly as to his intended testimony.

No. 19-50830

On appeal, Cynthia argues that the district court incorrectly concluded that Brown's testimony was irrelevant, and the erroneous exclusion deprived her of "necessary evidence of her mental state." She argues that by showing the jury that $409,000 in gross receipts were inadvertently included in their tax returns (which would have increased their tax liability) and that she frequently paid for business expenses with personal funds, the jury could have concluded that the Hermans were not trying to willfully conspire to defraud the United States but rather that they were just bad at bookkeeping. Michael makes the same argument but frames it as a constitutional claim.[8]

## B. Standard of Review

This court reviews "the district court's decision to exclude expert witness testimony under an abuse of discretion standard, and the ruling will not be disturbed on appeal unless it is *manifestly erroneous*." *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (emphasis added) (internal quotation marks omitted) (quoting *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010)).

---

[8] Michael argues that the district court's exclusion of Brown's testimony violated his Sixth Amendment right to present a complete defense. The Supreme Court has recognized that the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). But the Constitution also "leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Id.* at 689–90 (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Further, as this court has recognized, the Supreme Court's "cases typically focus on categorical prohibitions of certain evidence and not discretionary decisions to exclude evidence under general and otherwise uncontroversial rules." *Caldwell v. Davis*, 757 F. App'x 336, 339 (5th Cir. 2018) (per curiam) (unpublished).

No. 19-50830

## C. Discussion

The district court excluded Brown's testimony both as irrelevant and as confusing to the jury. Under Federal Rule of Evidence 702, district courts act as gatekeepers to determine the relevance and reliability of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Federal Rule of Evidence 403 allows district courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury." FED. R. EVID. 403.

The Hermans argue that Brown's testimony was relevant to two issues: their intent and materiality. Regarding intent, to convict for conspiracy under Count One, the Government needed to prove that the Hermans had "knowledge of the unlawful objective and voluntary agreement to join the conspiracy," *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010), and to convict under the remaining counts for filing false tax returns (Counts Two through Seven), the Government needed to prove that the Hermans acted "willfully," 26 U.S.C. § 7206(1).

Regarding materiality, to convict under Counts Two through Seven, the Government needed to prove that the Hermans filed a tax return that they did "not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). A false statement on a tax return is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the [IRS]." *Neder v. United States*, 527 U.S. 1, 16 (1999) (first alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). This court has held that failing to report gross receipts is a material misrepresentation that can establish liability for filing false returns. *United States v. Holladay*, 566 F.2d 1018, 1020 (5th Cir. 1978) (per curiam).

In making its case to the jury, the Government relied on and repeatedly emphasized two facts: (1) through their restaurants, the Hermans

19

made $570,000 in cash that they did not deposit into the bank, did not tell their accountant about, and did not report on their taxes; and (2) the Hermans paid about $94,000 of personal expenses using business funds. Brown proffered that he would have testified about two different facts: (1) the Hermans' accountant, Greg Peden,[9] had overstated gross receipts on the Hermans' tax forms by $409,000 for the period between 2007 and 2012 by failing to deduct non-income items like loans and bank transfers; and (2) the Hermans paid about $94,000 in business expenses using personal funds.

First, the unreported cash, emphasized by the Government, and the overstated gross receipts, offered by the Hermans through Brown, are not related. Brown's testimony would have related to errors that Peden made in preparing defendants' tax returns—errors unrelated to the Hermans' failure to fully disclose their cash receipts. Indeed, this is the reason that the district court excluded Brown's testimony on this point: "[Brown's recomputation of gross receipts] doesn't bear upon at all on the issues of whether or not the Hermans failed to include cash receipts that the businesses have received on the appropriate returns." Because Brown's testimony about overstated gross receipts did not relate to the Government's allegations, the Hermans' argument that Brown's testimony was probative as to their intent or materiality is without merit.

---

[9] Greg Peden, CPA, was the Hermans' accountant since the late 1980s. Peden generated the Hermans' financial statements, prepared the business tax returns for Cindy's Gone Hog Wild, and prepared the Hermans' individual tax returns. Peden prepared the tax returns that led to the Hermans' indictment. He testified at the Hermans' trial but was not charged with any crimes. Peden primarily relied on the Hermans' bank statements to prepare financial statements and tax returns for the Hermans. It was Peden's understanding that all of the revenues from the Hermans' businesses were deposited into their bank accounts.

No. 19-50830

Second, paying personal expenses using business funds, emphasized by the Government, and paying business expenses using personal funds, offered by the Hermans through Brown, do seem to be related in that they are flip sides of the same coin—the Hermans sometimes paid business expenses with personal funds and sometimes paid personal expenses with business funds. The Hermans argue that such bookkeeping errors could have raised doubts as to whether they conspired to defraud the United States; the jury could have considered this testimony and concluded that the Hermans were not trying to willfully conspire to defraud the United States but rather their tax returns were incorrect because of the Hermans' "ignorance, inattention, and poor bookkeeping." In response, the Government argues that simply because the Hermans paid some business expenses with personal funds does not negate the evidence that establishes that the Hermans willfully paid personal expenses with business funds: the Hermans placed their childcare provider on the restaurants' payroll and labeled personal expenses, such as maintenance of their home pool, with accounting codes for specific categories of business expenses.[10]

The fact that the Hermans paid for some business expenses using personal funds does not negate the fact that they paid for personal expenses using business funds. However, as the Hermans' argue, it is plausible that the jury could have considered Brown's testimony and inferred that the Hermans were incompetent bookkeepers, which could tend to negate the "knowledge" element of 18 U.S.C. § 371, *Coleman*, 609 F.3d at 704, and the "willful" element of 26 U.S.C. § 7206(1). The Supreme Court's decision in

---

[10] To assist Peden in his preparation of their financial statements and tax returns, the Hermans used a coding system on their checks. The Hermans put a code on each check to show its purpose, and Peden then used the codes to enter amounts onto a balance sheet. The Hermans elected to code their checks themselves to reduce fees they paid to Peden's firm.

*Cheek v. United States*, 498 U.S. 192 (1991), lends some credence to the Hermans' argument. In *Cheek*, the Court held that, in the tax context, "willfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201. The Court also held that a defendant's good-faith belief that she was not violating the law need not be "objectively reasonable" to negate willfulness. *Id*. at 203. While instructive, however, *Cheek* is not on point because the Hermans are not claiming ignorance of the tax laws but rather that they made many mistakes in their efforts to comply with tax law.

Even if Brown's testimony regarding the Hermans' payment of business expenses with personal funds were relevant, such testimony had the potential to confuse the jury. The Government put on evidence that the Hermans paid $94,000 in personal expenses from business funds: "In total, between 2007 and 2012, defendants' businesses paid more than $94,000 in personal expenses—$50,376 in wages for their nanny, $19,528 toward defendants' residential electric bills, $5,274 toward their personal water bills, $7,049 toward defendants' personal propane bills, $4,564 on their residential mortgage, and $1,458 toward defendants' pool service." Brown would have testified that the Hermans paid approximately $94,000—coincidentally, the same amount—in business expenses from their personal funds. But any probative value of Brown's testimony would have been substantially outweighed by the risk of confusing the jury. FED. R. EVID. 403. The jury may have considered these two $94,000 amounts as cancelling each other out. Or the jury may have considered Brown's analysis to be a recomputation of the Hermans' tax deficiency, which the jury might have viewed as important but was actually irrelevant to the case. Indeed, Brown acknowledged on cross-examination in voir dire during his proffer, that his testimony would not have gone to whether the Hermans were depositing all

No. 19-50830

of their cash receipts, whether Agent Fannin's work was correct regarding whether the Hermans had $570,000 worth of undeposited cash receipts, or whether the personal expenses that the Hermans paid through their business were, in fact, not personal expenses.

For the above reasons, and because of our deference to district courts' evidentiary rulings, we find that the district court did not err in excluding Brown's testimony regarding the Hermans' overstated gross receipts and payment of personal expenses with business funds.

## IV.

The Hermans next argue that the district court erred when it limited cross-examination of two Government witnesses—Greg Peden, the Hermans' accountant, and Agent Fannin[11]— about errors Peden made in violation of their Sixth Amendment confrontation rights.

"This court reviews claims of Sixth Amendment Confrontation Clause violations de novo and subject to a harmless-error analysis." *United States v. Gentry*, 941 F.3d 767, 781 (5th Cir. 2019). "Once the Confrontation Clause of the Sixth Amendment has been satisfied, limitation of cross-examination is reviewed for abuse of discretion." *Id.* (quoting *United States v. Roussel*, 705 F.3d 184, 194 (5th Cir. 2013)).

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The "primary interest" the Confrontation Clause secures is "the right of cross-examination." *Davis*

---

[11] The Government argues that the Hermans waived this issue on appeal by inadequately briefing it. Both of the Hermans state their arguments and provide supporting record citations and legal authority. As in *supra* note 1, we find the Hermans adequately briefed this issue on appeal and reject the Government's waiver argument.

*v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). However, "[t]he district court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Skelton*, 514 F.3d at 439 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). To establish a Confrontation Clause violation, "the defendant need only show that 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination.'" *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010) (quoting *Skelton*, 514 F.3d at 439). "The Confrontation Clause . . . is satisfied where defense counsel has been 'permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (quoting *Davis*, 415 U.S. at 318).

The Hermans argue that by limiting cross-examination of Peden and Agent Fannin regarding Peden's accounting errors, the district court prevented them from exposing facts to the jury that might have allowed jurors to infer that the Hermans' faulty tax returns were the result of negligence or carelessness rather than willfulness. This argument is without merit. As discussed, *supra* section III, any miscalculation Peden made as to gross receipts on the Hermans' tax returns is irrelevant to the issue of whether the Hermans failed to report cash receipts. Peden prepared their financial statements and tax returns based on the Hermans' bank statements, but the Hermans allegedly hid cash from Peden by not depositing it in the bank in the first place. So any errors Peden made are unrelated to the conduct—not depositing cash—on which the Government based its case against the

Hermans.  The district court properly exercised its "wide latitude" and "impose[d] reasonable limits" on cross-examination based on "concerns about . . . confusion of the issues . . . [and] interrogation that is . . . only marginally relevant." *Skelton*, 514 F.3d at 439.  There was no Confrontation Clause violation in the district court's limiting of cross-examination of Peden and Agent Fannin.

V.

Cynthia argues that Count One of the indictment was legally insufficient.  We review a preserved challenge to the sufficiency of the indictment de novo. *United States v. Grant*, 850 F.3d 209, 214 (5th Cir. 2017).

Count One charges Michael and Cynthia with violating 18 U.S.C. § 371.  This statute criminalizes conspiracy (1) "to commit any offense against the United States" *or* (2) "to defraud the United States."  18 U.S.C. § 371.  Count One charges the Hermans with violating the second clause, referred to as the "defraud clause."

Cynthia argues that Count One of the indictment is legally insufficient because it failed to include an essential element: that "the alleged fraud be directed at a foreseeable government proceeding."  This is not a recognized element of § 371.  Cynthia's legal theory is that this court should extend a rule announced in a recent Supreme Court case, *Marinello v. United States*, 138 S. Ct. 1101 (2018)—to convict under 26 U.S.C. § 7212(a)'s omnibus clause, the Government must show a "nexus" between the defendant's conduct and a pending or reasonably foreseeable tax-related proceeding, such as an investigation or audit, *id.* at 1109–10—and apply it to § 371.  We decline to apply *Marinello*'s nexus requirement to § 371's defraud clause and accordingly hold that Count One charged all essential elements and was therefore legally sufficient.

No. 19-50830

Supreme Court jurisprudence on § 371 is well settled. Nearly 100 years ago, the Court considered the predecessor of § 371 and announced that "[t]o conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Subsequent decisions have repeatedly reaffirmed *Hammerschmidt*'s construction of the defraud clause. *E.g., Tanner v. United States*, 483 U.S. 107, 128 (1987); *Dennis v. United States*, 384 U.S. 855, 861 (1966); *United States v. Scharton*, 285 U.S. 518, 521 (1932). Our court has also repeatedly relied on *Hammerschmidt* and its progeny when considering conspiracies charged under the defraud clause. *E.g., United States v. Martin*, 332 F.3d 827, 834 (5th Cir. 2003); *United States v. Hopkins*, 916 F.2d 207, 213 (5th Cir. 1990); *United States v. Haga*, 821 F.2d 1036, 1038–41 (5th Cir. 1987).

The recent Supreme Court decision in *Marinello v. United States* lives in a separate vein of law. In *Marinello*, a jury convicted the defendant for violating, among other criminal tax statutes, the "omnibus clause" of 26 U.S.C. § 7212(a), which criminalizes conduct that "corruptly or by force or threats of force . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of [the Internal Revenue Code]." At issue was the scope of the statutory phrase "due administration of [the Internal Revenue Code]" and whether it "cover[ed] routine administrative procedures that are near-universally applied to all taxpayers, such as the ordinary processing of income tax returns" or whether the phrase had a "narrower scope." 138 S. Ct. at 1104. The defendant argued that the phrase should be interpreted to have a narrow scope that would require the Government to show that he had tried to interfere with a "'pending IRS proceeding,' such as a particular investigation." *Id*. at 1105.

26

No. 19-50830

The Supreme Court agreed with the defendant and announced a new rule: to convict under § 7212(a)'s omnibus clause, the Government must show a "nexus" between the defendant's conduct and a pending or reasonably foreseeable tax-related proceeding, such as an investigation or audit. *Id.* at 1109–10. In reaching this decision, the Supreme Court considered § 7212(a)'s legislative history, *id.* at 1106–07; the broader context of the Internal Revenue Code, *id.* at 1107–08; and another Supreme Court case, *United States v. Aguilar*, 515 U.S. 593 (1995), that established a nexus requirement for the "similarly worded criminal statute" 18 U.S.C. § 1503(a), *id.* at 1105–06. The *Marinello* Court did not address, cite, or analogize to 18 U.S.C. § 371 or *Hammerschmidt* and its progeny.

Cynthia's only argument that Count One of the indictment is legally insufficient is that it failed to include the *Marinello* nexus requirement that "the alleged fraud be directed at a foreseeable government proceeding." She advances plain text and policy arguments, but they are not persuasive.

First, Cynthia asserts that because § 371 criminalizes "obstruct[ion] . . . of . . . lawful governmental functions by deceit," *Hammerschmidt,* 265 U.S. at 188, and because § 7212(a) criminalizes tax obstruction, the two statutes have "identical" "obstruction element[s]." This argument fails based on the plain text of § 7212(a) and § 371. *Marinello* turned on the interpretation of a statutory element that does not exist in and has no bearing on § 371. To violate the omnibus clause of § 7212(a), a defendant's conduct must "obstruct . . . the due administration of [the Internal Revenue Code]." 26 U.S.C. § 7212(a). This "due administration" element does not appear in § 371. Rather, 18 U.S.C. § 371 penalizes conduct that "defraud[s] the United States."

Second, Cynthia asserts that the policy concerns that animated the *Marinello* Court—"deference to Congress and the need for fair warning"—

"apply with equal force to a conspiracy to defraud by obstruction." This is similarly unpersuasive. Regarding deference to Congress, the *Marinello* Court examined the legislative history specific to § 7212, which bears little if any relevancy to the interpretation and application of § 371. Regarding the need for "fair warning," the *Marinello* Court was concerned that interpreting § 7212's omnibus clause "as applying to all Code administration would potentially transform many, if not all" minor violations of IRS rules—such as "pay[ing] a babysitter $41 per week in cash without withholding taxes"—into felonies for tax obstruction. *Marinello*, 138 S. Ct. at 1107–08. There is no similar risk of boundlessness in § 371 convictions. The Supreme Court has made it clear that violation of § 371's defraud clause requires obstructing "lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188.

Persuasively, the only two circuit courts that have considered extending the *Marinello* nexus requirement to § 371 have declined to do so. The Second Circuit announced that *Marinello* was "inapposite" when considering a § 371 conviction because "in that case, the Supreme Court analyzed 26 U.S.C. § 7212(a)'s unique text, context, and history—which are wholly unrelated to § 371's defraud clause." *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020). Similarly, the Eighth Circuit rejected *Marinello* as inapt because "the broad language in § 371 makes no reference to 'the due administration [of the Internal Revenue Code].'" *United States v. Flynn*, 969 F.3d 873, 879–80 (8th Cir. 2020) (alteration in original), *cert. docketed*, 20-1129 (Feb. 17, 2021). Here, the district court declined to extend *Marinello* to the Hermans' case for the same reason: "[t]he limitations on the substantive offense of 26 U.S.C. § 7212(a) do not apply to . . . conspiracies charged under the general conspiracy statute of 18 U.S.C. § 371." *United States v. Herman*, No. AU-17-CR-301-XR, 2019 WL 1865284, at *2 (W.D. Tex. Apr. 24, 2019).

In sum, we join our sister circuits in declining to extend the *Marinello* nexus requirement to § 371's defraud clause, and accordingly hold that Count One of the indictment is legally sufficient.

## VI.

Finally, the Hermans argue that the cumulative effect of the district court's trial errors requires the reversal of their convictions.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). "Cumulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (internal quotation marks omitted) (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). Put another way, "[t]he doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial." *Id.* This court has "repeatedly emphasized" that the cumulative error doctrine "necessitates reversal only in rare instances" and "the possibility of cumulative error is . . . practically never found persuasive." *Id.* (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)).

Because we have found that the district court did not commit reversible error in any of the issues presented in this case, "there are no errors that we could aggregate to find cumulative error." *United States v. Eghobor*, 812 F.3d 352, 361 (5th Cir. 2015).

No. 19-50830

## VII.

In conclusion, the district court did not reversibly err in its evidentiary rulings nor infringe on the Hermans' Sixth Amendment rights to confront witnesses and present a complete defense, the indictment was legally sufficient, and there was no cumulative error requiring the reversal of the Hermans' convictions. AFFIRMED.